TESSIE GOTTLIEB,
Plaintiff—below, Appellant,

*vs.*

HEYDEN CHEMICAL CORPORATION, a corporation of the State of Delaware,
Defendant—below, Appellee.

*Supreme Court, On Appeal, July 17, 1952.*

WOLCOTT and TUNNELL, Justices, and RICHARDS, President Judge, sitting.

*Robert C. Barab*, for plaintiff-below, appellant.

*Richard F. Corroon*, of Berl, Potter & Anderson, and *Harmon Duncombe* and *George Rowe, Jr.*, New York City, for defendant-below, appellee.

TUNNELL, Justice, delivering the opinion of the court:

On the 14th day of March, 1951, the nine members of the board of directors of defendant corporation unanimously adopted what is referred to in *Section 130A of the Internal Revenue Code*, 26 *U.S.C.A.* § 130A, as a "restricted stock option plan". The plan provided, (1), for granting to seven specified officers of the company, six of whom were members of the board of directors, an option to purchase various designated amounts of the common stock

of the corporation, totalling 24,500 shares, and (2), for setting aside the further quantity of 25,500 shares under options to such officers and key employees of the corporation as a certain committee created especially for the purpose should from time to time, prior to January 1, 1956, designate. The stock necessary for the plan was to come from shares which had been re-acquired or which had been previously authorized but not previously issued. The participants in the plan were to be permitted to buy the stock at such prices as should be fixed by the board of directors, but no option price could be lower than 95% of the highest price at which the company's stock was sold on the New York Stock Exchange on the date of conferring the option in question. The term of the option could not exceed seven years and was subjected to this further limitation:

"The term of the option shall be divided into three approximately equal periods and not more than one-third of the option shares may be purchased during each period, provided, however, if the participant does not purchase the full number of shares to which he is entitled during any such period, he may purchase those shares in any subsequent period during the term of the option."

The options were made non-assignable and non-transferable, except that in case of the death of any participant, the legal representatives, distributees, or legatees of such decedent were permitted, within three months thereafter, to exercise the option with respect to any shares the participant had been eligible to purchase upon the date of his death.

Any optionee was permitted the right to exercise his option only so long as he remained an employee of the corporation or of one of its subsidiaries, except that if he voluntarily resigned with the consent of the board, or if he became totally disabled, or if he retired upon reaching the normal retirement age under the corporation's plan of retirement, he might, within three months thereafter, exercise the option. Each participant at the time he was granted an option was to execute an agreement containing such terms as the board of directors might deem advisable, provided that they were consistent with the terms of the plan.[1] The plan

---

[1] Just how this proviso can be reconciled with the unrestricted power to amend the plan elsewhere conferred upon the board is not altogether clear.

was not to become operative until first ratified by an affirmative vote of the holders of a majority of the outstanding shares of common stock entitled to be voted thereon.

Finally, it was provided that the board of directors might amend or discontinue the plan at any time.

On the 26th day of April, 1951, at a duly noticed meeting of the stockholders, the said option plan was approved by the holders of a majority of the stock. The stockholders were furnished the names of the seven officers with whom contracts for options under the plan had already been made, the number of shares allocated to each, the price per share each of said officers was to pay, and the schedule of waiting and working periods specified in all seven contracts, namely, beginning on January 1, 1952; July 15, 1953; and November 15, 1955, respectively, and ending on March 13, 1958. One of the said seven officers, Ralph W. Lulek, had on January 1, 1950, prior to the formulation of the option plan, entered into a contract of employment securing his services to the corporation on stipulated terms (including a clause reserving a place for him in any future incentive compensation plan) until December 13, 1954. The record does not indicate whether or not the stockholders knew of Lulek's contract. Not any of the other six officers in the plan on the date of the meeting of stockholders was under any employment contract or subsequently entered into any such.

In regard to its purpose, the official draft of the plan begins by this recital:

"The Board of Directors believes that the interests of the Corporation and its stockholders will be advanced by the establishment of a Restricted Stock Option Plan which will provide an incentive to the key executive employees of the Corporation and its subsidiaries, who are responsible for its future growth and development and its continued financial success, to acquire a proprietary interest in the Corporation."

The proxy statement which management sent out to stockholders with the notice of meeting, after referring to certain provisions of the *Revenue Act of* 1950 relating to stock options, went on to say:

"In view of this new legislation and in order to provide the key managerial personnel of the Corporation with an opportunity to acquire a greater proprietary interest in the Corporation, the Board of Directors at a meeting held on March 14, 1951, adopted a Restricted Stock Option Plan providing * * *."

The option agreements and the minutes of the stockholders' meeting held.on the 26th day of April, 1951, contain a similar explanation of the purpose of the plan.

Immediately after the aforesaid meeting of stockholders at which the plan was approved, plaintiff, a beneficial owner of common stock of defendant corporation, brought this action in the Court of Chancery seeking to cancel the outstanding option agreements covering the 24,500 shares and to enjoin the execution of any further option agreements under the above-described plan. The theory of plaintiff's action is twofold, first that the options were in effect gifts to certain officers and employees, in return for which they neither promised to do, nor were otherwise bound to do, anything which the law will recognize as valid consideration, and secondly, that the plan entailed amendment of the corporate charter of defendant in such a fashion as to destroy the pre-emptive rights of stockholders in respect to such portions of the 50,000 shares as had never previously been issued. Plaintiff denominated these pre-emptive rights "vested" rights, and thus contended that they were not susceptible of being so simply extinguished. It was conceded in the presentation of the case that at least a substantial portion of the stock for the option plan would necessarily have to come from previously unissued shares.

In the Court of Chancery both parties filed affidavits; interrogatories were propounded and replied to; and a first stipulation was filed. Upon a record made up of those items, as well as the complaint and answer, the parties filed cross-motions for summary judgment.

On October 8, 1951, the Chancellor filed an opinion which is reported in 32 Del.Ch. 231, 83 A.2d 595, 598; stating his views in part as follows:

"It is true, as the court pointed out in Rosenthal v. Burry Biscuit Co., supra, that the mere desire to grant an interest by way of stock ownership, without more, is not sufficient consideration to support such a plan. However, it must be apparent that every stock option plan has as its purpose the desire to give corporate officials an opportunity to acquire a stock interest in the corporation. The crucial question is whether the ultimate objective behind such purpose is calculated to benefit the corporation to such an extent that it constitutes legal consideration."

The opinion also ruled out plaintiff's argument based upon the theory of pre-emptive rights. The Chancellor, therefore, declined at that stage to dispose of the case on summary judgment, proposing to await development of the "true picture" on final hearing.

Thereupon, the parties entered into the following stipulation:

"* * * the Board of Directors at the time of the adoption of defendant's Restricted Stock Option Plan believed that the interests of defendant and its subsidiaries would be advanced by providing, pursuant to said Plan, for the granting of options to purchase stock of defendant to officers and key employees who are responsible for defendant's future growth and development and continued financial success."

There was no other language in the stipulation which requires recording here.

Upon the filing of this second stipulation, the Chancellor, without further opinion, entered an order granting the motion of the defendant for summary judgment and denying the plaintiff's motion. From this judgment plaintiff has appealed.[2]

The Chancellor was apparently satisfied that whatever elements of defendant's case had been lacking at the time of the filing of his opinion had been supplied by the stipulation. The stipulation, however, had merely referred to the board of directors, establishing that the members thereof had honestly believed "that the interests of the defendant and its subsidiaries would be advanced" by the plan, without indicating in any way what form that advancement would take or what mechanics it would involve. The Chancellor, therefore, must have viewed the element of the directors' good faith as placing the transaction in the category of those matters which are finally settled by the exercise of the honest "business judgment" of the board. Defendant so interpreted the Chancellor's action and has pressed for our approval of that theory.

■■ We recognize the force of the universally acknowledged principle of law which leaves many matters to be finally settled by the sound business judgment of the directors, but we do not

---

[2] Any person having occasion to refer to this opinion should also note the opinion in *Kerbs v. California Eastern Airways*, 32 *Del.Ch.* 219, 90 *A.2d* 652.

understand it to be invoked by a simple showing of the kind set out in this stipulation. As a matter of fact, in a case, such as the one *sub judice,* where a majority of the directors representing the corporation are conferring benefits upon themselves out of the assets of the corporation, we do not understand that rule to have any application whatever. Human nature being what it is, the law, in its wisdom, does not presume that directors will be competent judges of the fair treatment of their company where fairness must be at their own personal expense. In such a situation the burden is upon the directors to prove not only that the transaction was in good faith, but also that its intrinsic fairness will withstand the most searching and objective analysis. *Fletcher, Cyclopedia of Corporation Law, Vol.* 3, *Sec.* 921. *Lofland v. Cahall,* 13 *Del.Ch.* 384, 118 *A.* 1. The stipulation here settled that the board "believed" that, all things considered, the corporation would derive benefits from the plan, but the necessity for the directors to prove that the bargain had in fact been at least as favorable to the corporation as they would have required if the deal had been made with strangers was wholly left out of account.

█ And directors may be mistaken as to the law of a transaction. When a board acts under a misconception of the law on a vital point, judicial review is in order, without there being any question of bad faith. Honest directors conceivably might give away to their associates in the enterprise substantial amounts of a corporation's property in the belief that the gift would produce such gratitude that ultimately the corporation's generosity would be more than repaid. There would be nothing immoral or dishonest about such an action, but it would not be legally sound.

But while the stipulation, referring, as it did, only to the state of mind of the board of directors, and failing to disclose the nature and extent of the consideration for the contracts, lent no decisive support to defendant's motion for summary judgment, upon analysis of the stipulation alone we can only conclude that if defendant was not entitled to judgment when the opinion was filed, it was still not entitled to judgment when judgment was entered. Obviously our duty is not discharged by such a relative and hypothetical deliverance. Both parties sought, and still seek, summary

judgment. We must, therefore, study the positions of the respective parties at the time of the Chancellor's opinion.

■ As we view stock option plans, they are governed by no new or unusual rules, but by the familiar principles of contract. There must be a consideration for the granting of an option. Nobody has expressed this principle better than the Chancellor himself did in *Rosenthal v. Burry Biscuit Corporation*, 30 *Del.Ch.* 299, 60 *A.2d* 106.

■ ■ Plaintiff says that she is entitled to judgment because the option plan, the proxy notices, the corporate minutes, and the option agreements all recite something as if it were consideration which the courts are unable to recognize as such. It is true that the only purpose stated is to assist certain officers and key personnel in buying stock in the company, which, as the Chancellor very properly declared, is the immediate object of all stock option plans and cannot itself be legal consideration for any. See the opinion in this case below and also *Rosenthal v. Burry Biscuit Corporation*, *supra*. But we cannot hold, as plaintiff would have us do, that defendant is thereby altogether foreclosed. Consideration is the favorite child of the law of evidence, and if this matter should go to trial, it is open to defendant to prove by parol that there is consideration which is referred to in the recitals of the contracts only in the most oblique way. 20 *Am.Jur.*, *p.* 977; 32 *C.J.S.*, *Evidence*, § 948, *p.* 869; *Koplar v. Warner Bros. Pictures, Inc.*, *(D.C.Del.)*, 19 *F.Supp.* 173.

Perhaps it may be regarded as unfortunate that management did not somewhere in this record make some statement to show that it understood—if, indeed, it did—what would be legal consideration for a contract of this kind. We certainly must disapprove the position of defendant's counsel that the mere honesty of the directors supplies the necessary consideration. But on summary judgment, at least, we may draw no ultimate conclusion from a failure to define or talk about legalities. We should certainly not find, contrary to the fact, that a consideration was present merely because a recital in the contract piously proclaimed that it was. By the same token, if such consideration is necessarily inherent in the plan, it is a judicial responsibility to detect it and

give it recognition. And if it is not necessarily inherent in the terms of the plan, but may appear from the attending facts and circumstances, then it is the court's duty to hear the testimony and consider those facts and circumstances.

Valid consideration for a contract of this character may be present in any of various forms.[3] The most usual illustrations, of course, are covenants to do something for the corporation. In the absence of any express agreement to do anything, however, as we observed above, consideration may be inherent in the plan itself, as for the reason that the employee will be unable to take advantage of the option plan unless he first renders substantial services to the corporation.

This last species of consideration is the one defendant says is present here. Its counsel state the contention thus:

"By continuing to render services to the corporation through the future dates and by payment of the prescribed price the employees accept the offer and supply the required consideration."

This language, of course, refers only to the agreements already executed and stands upon the requirement that the optionees were compelled to wait until January 1, 1952, to take advantage of the first available installment, and until later dates for the further lots of stock.

We have already seen that if the only corporate action on the plan were what was taken by the board of directors, summary judgment for defendant, without any evidentiary fortification of the fairness and reasonableness of the plan, would be unwarranted. But defendant has a more appealing argument. The plan was approved by the stockholders. Therefore, defendant contends, and plaintiff, of course, denies, that ratification settles the matter.[4]

Ratification by stockholders, indeed, is frequently decisive of controversies in this field of law. In some instances it is

---

[3] More fully discussed in Justice Wolcott's opinion in *Kerbs v. California Eastern Airways, Inc., Del.Ch.,* 90 *A.2d* 652.

[4] There being no suggestion that the beneficiaries of the plan owned, or controlled the votes of, a majority of the stock.

the only type of corporate action which is not voidable. In other instances its purpose is simply to permit the action of the board of directors to be reviewed on its merits, without the handicap of enforced suspicion which would otherwise be present where board members have represented themselves as well as their corporation. But unless ratification is unanimous, it can never constitute the only requisite to validity. An unconscionable deal between directors personally and the corporation they represent could not become conscionable merely because most of the stockholders were either indifferent or actually in sympathy with the directors' scheme. Certainly gifts to themselves or to their business associates will not avail against the vote of any qualified objector. Since a gift may be a gift in part only, a totally inadequate consideration, of course, invokes the same principle as the absence of any at all. *Rogers v. Hill,* 289 *U.S.* 582, 53 *S.Ct.* 731, 77 *L.Ed.* 385.

Therefore, although the plan was ratified by stockholders, and no question is raised as to the completeness of the material disclosure, or as to control of stockholders by the beneficiaries, we must still examine the facts when a charge of waste is interposed. We must evaluate the services to be rendered by the particular employees for the periods reserved, and to that factor we must relate the values of the respective options. That, of course, we are entirely helpless to do upon this record, for the case did not proceed to the point of taking evidence on these questions.

But not even the unevaluated show of consideration for the first installment of shares which, as above mentioned, appears in the option agreements,[5] can be said to apply to the 25,500 shares not yet covered by any agreement. Plaintiff therefore, contends that the total absence of consideration as to those shares automatically taints the entire scheme with illegality. We are unable to agree.

The flaw in the instant argument is that the stockholders by a single vote did two different things. They ratified seven actual outstanding stock options, covering 24,500 shares, and also a plan

---

[5] In the form of a requirement that the optionee remain on the payroll (subject to the above-mentioned exceptions) until January 1, 1952.

for issuing other options, involving not exceeding 25,500 additional shares. Nobody can claim that actual stock options to persons not yet ascertained, for services not yet defined or perhaps even contemplated, have themselves been ratified. This is obviously a matter for future concern. Therefore, we presently see no fatal deficiency in the option plan affecting those shares. Options as to them will stand or fall by what remains yet to be done. *Holthusen v. Edward G. Budd Mfg. Co., (D.C.),* 50 *F.Supp.* 621.

The same answer is in part applicable to plaintiff's earnest claim that the ratification by stockholders is wholly illusory, and therefore nugatory because the plan itself contains a clause permitting the directors to make it over. If this criticism is applied to the 25,500 shares, the controlling facts are not yet *in esse* or even imminent in any recognizable form. Nobody can pass upon them now. As to the 24,500 shares, on the other hand, the power of amendment means nothing, because as to them the time for amendment is long past. At the time of the meeting of stockholders the contracts had already been executed, and as of that date neither party alone could alter rights under the contracts, except that, under an express provision in the contracts, the adverse vote of the stockholders could set them aside. That, however, the stockholders elected not to do.

In our view of the matter, therefore, neither plaintiff nor defendant is entitled to summary judgment on a question as to the presence or absence of consideration which has a value reasonably related to the concessions made by the corporation.

Having yet another string to her bow, plaintiff urges remand of the cause with an order for summary judgment in her favor because she says that the proposed amendment to the corporate charter, providing for the issuance of up to 50,000 shares of stock without the said 50,000 shares being subject to pre-emption, is an unlawful attempt to destroy her "vested rights". She contends that the amendment would violate those provisions in both the state and federal constitutions which forbid abrogation of the obligations of contract or deprivation of property rights without due process of law. She also says that the amendment is invalid

because it is not within any of the classes of amendment specifically authorized by *Section 26 of the Delaware General Corporation Law, Par. 2058, Revised Code of Delaware, 1935, as amended.*

These arguments of plaintiff have this quality, that if either of them prevails, it is not only the instant stock option plan which will be defeated, but also any alternative one involving a new issue of stock. But we do not agree that plaintiff's pre-emptive rights have any such force or effect.

Article 10 of defendant's certificate of incorporation is in these words:

"Tenth: From time to time any of the provisions of this Certificate of Incorporation may be amended, altered or repealed, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted in the manner and at the time prescribed by said laws, and all rights at any time conferred upon the stockholders of the Corporation by this Certificate of Incorporation are granted subject to the provisions of this Article."

*Sec. 26 of the Delaware General Corporation Law, Par. 2058, Revised Code of Delaware, 1935, as amended,* is in part as follows:

"Any corporation * * * may * * * amend its Certificate of Incorporation * * * by changing the * * * designations, preferences, or relative, participating, optional, or other special rights of the shares, or the qualifications, limitations or restrictions of such rights * * * *or by making any other change or alteration in its Certificate of Incorporation that may be desired* * * * provided that every Certificate of Incorporation as so amended, changed or altered, shall contain only such provisions *as it would be lawful and proper to insert in an original Certificate of Incorporation* made at the time of making such amendment." (Italics supplied.)

*Sec. 5 of the Delaware General Corporation Law, Par. 2037, Revised Code of Delaware, 1935,* provides in part:

"10. The Certificate of Incorporation may * * * contain such provisions as may be desired limiting or denying to the stockholders the pre-emptive right to subscribe to any or all additional issues of stock of the corporation of any or all classes."

■ As the Chancellor pointed out in his opinion, there is a difference among courts and scholars of jurisprudence as to what is actually the purpose of pre-emptive rights. Some authorities regard them as safeguarding a stockholder's right to maintain ownership of his proportionate share of the assets, and some as

protecting a proportion of the voting control. Under either of these theories, however, or the sensible third view that both of the first two theories are simultaneously applicable, we still arrive at the conclusion that striking it down by amendment is no violation of the plaintiff's constitutional rights.

Taking first the view that a money interest is the thing which is primarily guarded by pre-emptive rights, we are confronted by such cases as *Davis v. Louisville Gas and Electric Company*, 16 *Del.Ch.* 157, 142 *A.* 654, where the constitutionality of an amendment was upheld which, among other things, reduced the participation of Class B stock in the dividends, as compared with Class A stock, from four-to-one to an equal division, and altogether abolished the original right of the corporation to redeem Class A stock for $32.50 per share.

Then turning to the view that pre-emptive rights are designed to guarantee the stockholder his original fraction of voting control, we are unable to perceive any difference in the constitutional implications. We know of no authority holding that voting rights are more sacred or less mutable than money rights. It has heretofore simply been taken for granted that voting rights, so far as the constitution is concerned, are as amendable as any other. See *Maddock v. Vorclone Corporation*, 17 *Del.Ch.* 39, 147 *A.* 255. We should be at a loss to explain any other holding.

Indeed, discussion of the distinction between money rights and voting rights leads us nowhere in the solution of this problem. The criterion we must observe is the one which plaintiff overlooks when she cites in her support the rule of *Consolidated Film Industries, Inc., v. Johnson*, 22 *Del.Ch.* 407, 197 *A.* 489. In that case this court declined to permit an amendment to extinguish the expectancy of collecting cumulative dividends after there had already been a succession of preferred dividend defaults. Such an amendment, of course, was invalid, and was held to be, because it was an attempt to deprive stockholders of earnings already in effect accrued to them under the existing charter. Corporations are by statute given the power to change their structural characteristics and operational rules, within the bounds defined by law, for prospective application. But the rules may not be altered

so as to change the outcome of a game which has already been played. Our case does not have that offending characteristic; it is purely prospective in its operation.

Any interpretation other than the one we feel bound to adopt would seriously impair the existing rights of the holders of a majority of the stock. They purchased their holdings under the assurance of the *Delaware General Corporation Law,* as well as of the terms of the particular contract of the State of Delaware with defendant, that the defendant corporation, in which they were about to buy an interest, would have the right from time to time to make amendments to its charter, at the direction and with the approval of the holders of a majority (or other specified percentage) of the stock, and would thus be in a position to adjust itself to the exigencies of changing business conditions. Similarly, the minority stockholders purchased their holdings with full notice of this same mutability. The majority, therefore, cannot now be frozen by the minority to a charter which the majority regards as out of date.

Moreover, we see no merit whatever to the plaintiff's other contention as to pre-emptive rights, that the statute does not authorize this type of amendment. This argument depends upon an independent analysis of each of the single statutory phrases preceding the general grant of authority to amend, all the while, however, necessarily ignoring the comprehensive language which gives general permission to amend, provided only that nothing is inserted which would be illegal in a new certificate. Plaintiff points out, and quite correctly, that the instant proposal is not an attempt to change a "designation", a "preference", a "relative", a "participating", or an "optional" right. Moreover, she says it cannot be a "special right" of the shares, because pre-emption was a right of all the shares in the company when she bought her stock, and not a right of only certain issues or classes. However, we cannot read the statute as a whole otherwise than as a provision for maximum elasticity within the proviso. Authority for the proposed amendment is clearly conferred by the statute.

The judgment of the Court of Chancery will be reversed and the cause remanded for trial.