Rose B. CHASIN, Plaintiff,

v.

Maxwell H. GLUCK et al., Defendants.

Court of Chancery of Delaware,
New Castle.

Aug. 26, 1971.

Reargument Denied Sept. 22, 1971.

Joseph A. Rosenthal, of Cohen, Morris & Rosenthal, Wilmington, and Harry C. Chashin of Marcus & Levy, Paterson, N. J., for plaintiff.

Bruce M. Stargatt and Jack B. Jacobs of Young, Conaway, Stargatt & Taylor, Wilmington, for the individual defendants.

MARVEL, Vice Chancellor:

Plaintiff, who concededly has been a stockholder of what was formerly known as A. S. Beck Shoe Corporation (now Beck Industries, Inc.) since February 7, 1962, sues derivatively for the alleged benefit of the defendant corporation. Her complaint named as defendants the directors of Beck as of the time of the matters complained of, and she sought relief from such directors of the defendant corporation for the loss sustained by it as a result of alleged breaches of fiduciary duty on the part of such defendants. However, the only directors who remain as parties defendant to this action are Maxwell H. Gluck and Saul Schiff, and the sole relief now sought is the recovery from said defendants of losses sustained by Beck by reason of the alleged failure of such defendants to cause Beck to demand timely payment of amounts owed the latter by Grayson-Robinson Stores, Inc., or to require Grayson to make such payments on time.

The background to the present litigation is briefly as follows. On December 4, 1961, Grayson-Robinson Stores, Inc., a nationally known department store chain, acquired a 51% stock interest in A. S. Beck Shoe Corporation at a cost to Grayson of $4,900,-000. Earlier, in November of 1960, the defendant Maxwell H. Gluck, had acquired a dominating position in the affairs of Grayson as the result of the purchase by him of 29% of its common stock. At a special stockholders' meeting held on December 19, 1960, Mr. Gluck then caused the election of his own nominees to the seven man board of directors of such corporation.

Thereafter, on December 15, 1961, at a special meeting of stockholders of Beck, a new board of directors for such corporation was elected which included seven Grayson directors as well as a personal friend of Mr. Gluck's out of a board of twelve, thereby giving the latter a dominating position in the affairs of Beck. Such control was later strenghtened when an independent director, namely Herbert C. Lee, resigned from the Beck board.

Another member of the Beck board during the time of the matters complained of was the defendant Saul Schiff. However, such defendant's election as a director of Beck did not depend on the influence of the defendant Gluck, Mr. Schiff's directorship being attributable to his 10,000 shares of stock of Shoe Company of America, of which he was also a director, such corporation having owned 51% of the stock of Beck from 1946 until the purchase of such stock by Grayson in December, 1961.

Grayson has traditionally operated a chain of department stores, which stores, as of mid-1962, were located in thirty-five states. Beck, having become interested in such stores as possible places for the sale of Beck's shoes and other products, in early 1961 made overtures to Grayson for the setting up of such an arrangement. As a result of negotiations, renting arrangements were ultimately agreed on between the two corporations, under the terms of which Beck agreed to market its products in designated areas of Grayson's stores in return for which the latter would receive a percentage of the profits made on sales of Beck's products. Grayson also undertook to supply maintenance and the like for such shopping centers. Such forms of lease, as noted above, were first entered into in 1961 and granted Beck the right to lease, eventually through subsidiaries, space in a number of Grayson stores. By early August 1962, Beck, through subsidiaries, was operating thirty-three so-called concessions in Grayson stores.

Under the terms of such leases, sales of Beck's shoes and other products were to be made by Grayson employees, the proceeds of such sales then being mingled with Grayson's own receipts. In certain of the Grayson stores, however, Beck provided supervisory personnel. The contracting parties further agreed that at the end of each month the sales attributable to Beck products were to be totalled and the net amount due Beck remitted to it, said remittances consisting of the receipts from gross sales of Beck products in Grayson stores minus the percentage allocable to Grayson for rent, maintenance and the like, as provided by the terms of the leases. In the case of the leases specifically in issue, net receipts, as above computed, were to be remitted to Beck by the tenth of each month. Such forms of lease continued to be used into 1962.

The record in this case discloses, however, that Beck did not receive net receipts due it from sales of its shoes in Grayson's stores during the first part of the year 1962, and it is in fact conceded by the present individual defendants that Grayson permitted its indebtedness to Beck to accumulate to the sum of $233,856.76, representing amounts due Beck from January 1, 1962 to August 14, 1962. However, the affairs of Grayson are now being administered in a chapter XI bankruptcy proceeding instituted on August 12, 1962, and the likelihood of any recovery by Beck of moneys due it from Grayson in such proceeding appears to be remote, the referee in bankruptcy for the United States District Court for the Eastern District of New York having determined on July 22, 1963 that the amount here in issue is merely an unsecured claim against the bankrupt of which type of claim there are many.

Plaintiff, in seeking relief from the present individual defendants, basically relies on the theory that such defendants, as directors of Beck, having allowed the indebtedness of Grayson to Beck improperly to accumulate, thereby breached their fiduciary duty to their corporation. It is alleged that because of their positions of authority in Grayson and Beck and their domination of the other officers and directors of Beck, they either had personal knowledge, or were, at the least, constructively aware of Grayson's increasingly drastic financial problems and nonetheless failed to act in time to protect Beck's interest. It is alternatively argued that such defendants were at the least guilty of negligence in not avoiding, or at least mitigating, Beck's loss resulting from Grayson's financial troubles, which eventuated in bankruptcy.

Plaintiffs pray for an order holding the individual defendants at bar accountable not only for the unrecovered indebtedness of Grayson to Beck but also for the sum of $3,685 spent for legal fees in a futile attempt to establish Beck's claim as being on a firmer basis than that of an unsecured creditor in Grayson's chapter XI bankruptcy proceeding, the referee in bankruptcy in such proceeding having found that a

trust as to such funds did not exist in Beck's favor.

Defendants contend, on the other hand, that their actions in regard to Beck's claim against Grayson should be regarded as having been reasonably taken, arguing that they acted in good faith and were not negligent. It is further claimed that the good will acquired by Beck as a result of its entrance into the business of marketing its product in leased space in Grayson department stores far exceeded in value any monetary loss claimed to have been sustained by Beck as a result of the matters here complained of.

The acts of the defendants Gluck and Schiff of which plaintiff complains are not basically concerned with the terms of the leases here involved, which, as originally negotiated, had been basically agreed on before plaintiff became a stockholder of Beck but rather with the alleged failure of such defendants to protect Beck's creditor position vis à vis Grayson, including the further extension of credit to Grayson by Beck after the latter had allegedly become aware that Grayson was a poor credit risk. Plaintiff claims specifically that the defendant Gluck's personal interest in Grayson was advanced by such continued extension of credit to Grayson, pointing out that the latter had personally guaranteed several large loans made to Grayson by banks.

By March of 1962 Grayson's financial situation had so deteriorated that the sum of $4,200,000 which had been borrowed through a pledge of all of its accounts receivable and inventory backed up by Mr. Gluck's personal guarantee failed to bring about payment in full of its accounts payable to its suppliers of merchandise. Plaintiff argues that the defendant Gluck not only had personal knowledge of these financial facts but was also aware of the reasons behind them but that he nonetheless permitted Beck to continue to deliver merchandise to Grayson despite the fact that the former had not received any payments on account for products sold by it in Grayson stores after January 1, 1962. Gluck contends in reply that it was not clear at all that Grayson, if helped, would not pull through its financial crisis and that it was good business judgment for him to seek to help Grayson to weather its financial troubles and thus secure its equity in Beck. Furthermore, in answer to plaintiff's contentions as to the present defendants' failure to protect Beck's interests, it appears that in July, 1962, despite the fact that Beck's board was dominated by Gluck, Beck was in fact successful in obtaining part payment of moneys due it from Grayson. However, a check for the amount of $141,245 so received was not honored and on a second attempt to cash it the Banker's Trust Company exercised its right to set off Grayson's account at such bank against its indebtedness to such lender, thus opening the way to Grayson's chapter XI proceedings. Earlier, in May of 1962, Grayson had paid Beck $51,000, thereby completing payments due Beck for 1961.

Plaintiff premises her basic case on the established doctrine that where there are interlocking boards of directors and there is domination of a subsidiary corporation by the parent, as exists here, there is no doubt but that an individual defendant, such as the defendant Gluck, who was in control of the parent Grayson, as of the time of the matters complained of, would appear to have the burden of proving that the transactions between Grayson and Beck, of which plaintiff complains, were entirely fair to Beck, Sterling v. Mayflower Hotel Corp., 33 Del.Ch. 293, 93 A.2d 107.

This rule, in my opinion, cannot be applied to the conduct of the defendant Schiff, a Shoe Company of America stockholder, whose financial interest in Beck was terminated when such corporation sold its 51% stock interest in Beck to Grayson in December 1961, before plaintiff was a Beck stockholder. Furthermore, Schiff, at the times here relevant, held no interest in Grayson. Thus, it is clear that the defendant Schiff was in a position freely to exercise his independent business judgment

and should not be found accountable to plaintiff and Beck's other stockholders in the absence of bad faith, negligence, or gross abuse of discretion, Warshaw v. Calhoun, 42 Del.Ch. 437, 221 A.2d 487. I find no evidence that he failed to exercise his business judgment properly.

■ Turning to the case against the defendant Gluck, I am satisfied, first of all, that the basic form of the leases here involved, under the terms of which Beck acquired space to sell its product in Grayson's stores, had been agreed on during the period between August and December 1961, or prior to Grayson's acquisition of Beck's stock. Thus, there can be no presumption of overreaching based on self-dealing insofar as the drafting of such form of leases is concerned. Plaintiff, however, goes on to contend that the individual defendants had a duty to have such leases renegotiated after Grayson had acquired its majority interest in Beck on December 4, 1961.

■ To begin with, I am of the opinion that the form of agreement which provided for the sale of Beck shoes and other products in Grayson's stores was entirely fair to Beck. In other words, these agreements provided for a reasonable profit to Beck and a popular outlet for Beck's product, marketed at a lower cost than Beck was subject to elsewhere, while, at the same time, yielding a reasonable profit to Grayson for the use of rental space within the confines of its established stores. I conclude that the form of agreement under attack was entirely fair to Beck and there is no reason in law why it should have been renegotiated after December 4, 1962.

Accordingly, the damages sustained by Beck, of which plaintiff complains, must arise not from the terms of the form of lease in issue but rather from the alleged failure on the part of the officer of Beck here charged to cause Grayson to perform as required to by the terms of such form of agreement. And it is the evidence, if any, of such claimed failure which the court must scrutinize for that type of self-dealing, which, if established, would result in holding the defendant Gluck individually liable for Beck's losses in the event his interest and actions in the transactions complained of are demonstrated to have failed to meet the test of the intrinsic fairness rule.

■ In the application of the intrinsic fairness rule the mere fact that interlocking directors are involved in an intercorporate transaction does not of itself cause the higher burden of proof called for under such rule to shift to the party sought to be charged with accountability. In other words, self-dealing on the part of a dominant fiduciary must first be established in order for the intrinsic fairness rule to be successfully invoked, Sinclair Oil Corp. v. Levien (Del.Supr.), 280 A.2d 717, and Getty Oil Company v. Skelly Oil Co., (Del. Supr.), 267 A.2d 883. It follows that plaintiff here must demonstrate self-dealing on the part of the defendant Gluck in order to require such defendant to carry the heavy burden imposed on him by the intrinsic fairness rule, a principle which plaintiff appears to recognize inasmuch as he relies on cases [1] concerned with obvious examples of director manipulation of corporate transactions for personal benefit.

■ Plaintiff has admittedly introduced evidence tending to show that Gluck could no doubt have hoped to be personally benefited as a result of the transactions complained of through reduction of his personal liability on his guarantees of Grayson debts, although the present record does not, in my opinion, sustain plaintiff's contention that Gluck did in fact benefit from Grayson's failure to pay Beck on time. Moreover, there is no direct evidence that Gluck caused Beck not to be paid, that Gluck restrained Beck from collecting the amounts due it from Grayson, or that Gluck influenced Beck not to discontinue shipments to

---

1. Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660, Pierce v. Wahl, 32 Del.Ch. 465, 86 A.2d 757 and Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904.

Grayson. An examination of the circumstantial evidence surrounding the questioned transactions similarly arrives at the conclusion that plaintiff has not placed in the record sufficient facts or inferences to support a charge of manipulation by Gluck of the transactions complained of the type required to render him personally accountable under the intrinsic fairness doctrine.

Grayson's debts to Beck made up less than two percent of Grayson's outstanding debts at the time of its bankruptcy and an even smaller percentage of its total indebtedness during the months directly preceding Grayson's bankruptcy. The amounts owed to each Beck division by Grayson were smaller than the amounts owed to several other trade creditors, and the amounts owed to all Beck divisions was not substantially larger than the claims of a number of other trade creditors. Substantially larger amounts were owed by Grayson to non-trade creditors. Finally, the event that made Grayson's eventual bankruptcy inevitable was an attempt by Grayson to pay Beck some $141,245 in back debts. In short, Beck's treatment by Grayson was substantially the same as that afforded the latter's other creditors at a time when Grayson was experiencing extreme cash shortages. I am persuaded that Gluck was not guilty of causing Beck, as one of many creditors of Grayson, to be discriminated against by Grayson.

Plaintiff argues, however, that because of his position as a fiduciary Gluck should have treated Beck differently than it treated other creditors of Grayson, by keeping its account with Grayson basically in balance in order to avoid any inference of self-dealing. However, in light of Grayson's eventual collapse such a course of preferential treatment might well have precipitated suits by other creditors against Gluck for the monies paid to Beck under such preferential treatment, 15A Fletcher, Cyclopedia Corporations § 7428, and Midland Supply Co. v. American Drilling Co., (C.A. 10) 302 F.2d 128. Fair treatment of Beck under the circumstances of this case means treatment equivalent to or substantially equivalent to that afforded Grayson's other creditors.

In conclusion, I am of the opinion on the basis of the entire record that no evidence of self-dealing has been adduced by plaintiff which would require Gluck to prove the intrinsic fairness of the transactions of which plaintiff complains.

I am also of the opinion that plaintiff has failed to carry the burden of demonstrating that the defendant Gluck was guilty of bad faith, negligence, or gross abuse of discretion, the type of conduct looked for when a non-self-dealing fiduciary is sought to be charged with responsibility for corporate losses injurious to minority stockholders, Warshaw· v. Calhoun, supra.

On notice, an order may be submitted granting a judgment of dismissal of the complaint against both the defendants Gluck and Schiff.