Henry MERRITT, Plaintiff,

v.

COLONIAL FOODS, INC., Jobemo Corporation, Joel Opatut, Ben Opatut, Morris Opatut, and Charles A. Culley, Jr., Defendants.

Court of Chancery of Delaware,
New Castle County.
Submitted: Aug. 27, 1985.
Decided: Jan. 7, 1986.

See also 499 F.Supp. 910.

Pamela S. Tikellis of Biggs & Battaglia, Wilmington, and Alfred V. Greco and Raymond F. Gregory, New York, for plaintiff.

Joseph A. Rosenthal of Morris & Rosenthal, P.A., Wilmington, and Lawrence Greenapple of Aurnou, Bobrow, Greenapple, Kurzman & Midler, New York, for defendants.

## OPINION

ALLEN, Chancellor.

Pending are cross motions for summary judgment and partial summary judgment in this class action challenging the fairness of a 1979 cash-out merger involving Colonial Foods Corporation, a Delaware corporation. The defendants, directors and controlling shareholders of Colonial, have moved for summary judgment on the grounds (i) that the merger was effected pursuant to a Notice of Merger and Information Statement that made full and fair disclosure of all material information necessary for minority stockholders to decide whether they should seek statutory appraisal of the value of their shares, and (ii) that the price of $3 per share paid to the minority stockholders was so obviously fair as to require no trial of any issue of fact. Thus, defendants assert that the undisputed facts establish that they have met their duty of dealing fairly with the minority shareholders, including paying an entirely fair price for their stock in the merger.

Plaintiff, who has been certified to represent a class of former shareholders of Colonial, moves for partial summary judgment on the issue of liability, asserting that undisputed facts demonstrate that the merger was not entirely fair to the minority stockholders. In particular, in addition to asserting that the materials employed to effectuate the merger (and a preceding tender offer) were marked by material omissions and misstatements, plaintiff alleges that a principal purpose of the cash-out merger was to force the termination of a then pending derivative lawsuit which challenged on behalf of Colonial a number of transactions between Colonial and the individual defendants or entities controlled by them. In summary plaintiff asserts that defendants have demonstrably violated both their duty to proceed with such a transaction only in a fair manner and their duty to pay a fair price. On this view trial of this matter will be necessary only to establish an appropriate remedy.

The parties have submitted a twenty-one page stipulation of facts and numerous affidavits. Based upon the facts thus established, I conclude that defendants have breached the duty of fair dealing which in the circumstances they owed to the minority shareholders of Colonial. In summary, the facts that together, in my opinion, establish that breach of duty in this case specifically include: (1) that the cash-out merger had the intended effect of terminating the pending derivative litigation that sought a recovery from the directors and controlling shareholders of the company and (2) that no independent agency, either board committee, special counsel or investment banker, provided an independent basis to conclude either that the claims asserted were without value to the corporation or that the cash-out price was fair, considering the value of those claims to the corporation. It is admitted that the merger price contained no element of value attributable to the derivative claims.[1]

I

1. *Management of the Business and Affairs of Colonial*

The three Opatut defendants are brothers who for more than thirty years have worked together in an egg production and distribution business. In 1969 they formed Colonial and transferred their business to it in exchange for 420,000 shares of Colonial's common stock. Thereafter, pursuant

---

1. Cf., *Chrysler Corporation v. Dann*, Del.Supr., 223 A.2d 384, 387 (1966) (defining a "meritorious" derivative claim for purposes of settlement).

to a public offering, Colonial issued 90,000 shares of common stock at $5.00 per share and issued certain convertible debentures which were later converted into an additional 78,150 shares. At all relevant times the Opatut brothers owned or controlled in excess of seventy percent of Colonial voting stock. The remaining defendant, Charles Culley is the only non-family member of the four-person Colonial board; he assumed the positions of President of Colonial and Board member in April, 1971. Although he was granted an option at that time to purchase 72,000 shares of Colonial's common stock from the Opatut family holdings at a price of $5.00 per share, he never exercised the option and otherwise never became a Colonial shareholder.

Colonial is a fully integrated firm engaged in the production, processing and distribution of fresh, shell eggs. The production of eggs, during the relevant periods, was carried on at three company-leased farms and at approximately 35 independently operated farms located in and around Douglas, Georgia. The company-leased farms include egg-processing facilities equipped with modern automated equipment capable of performing the entire processing operation necessary to deliver a carton of eggs ready for display and ultimate sale. Colonial has established subsidiaries through which it furnishes feed and transports the company's product to its own processing plants and to market.

Much of this organization was fashioned under the direction of the Opatut brothers during the 1970s. In managing Colonial's affairs throughout that period, the Opatut brothers engaged repeatedly in transactions with Colonial. As these transactions form the predicate for the later-filed derivative suit that charged the Opatut brothers and defendant Culley with mismanagement and self-dealing and which was terminated by the cash-out merger in issue here, it may be helpful to sketch them in broad outline. They include the sale to and lease back by the Opatuts of a company-owned egg farm; the construction by the Opatuts

of egg production facilities and the lease of them by the company; various purchases from and sales to the Opatuts by the company; a real estate transaction with an Opatut-controlled entity; and compensation payments to all defendants.

The sale and lease back transaction occurred in 1975. Acting through its Rite-Diet subsidiary, Colonial in 1974 had acquired Sunnyside Farm, a Georgia egg production facility. After the production capacity of that farm had been materially improved, in 1975 it was sold to the Opatut defendants and immediately leased back to Rite-Diet. The sale was financed in part by a $500,000 loan from the Colonial Foods Employee Stock Ownership Plan and by the payment of a $100,000 security deposit by Rite-Diet to the Opatuts on the lease. At the time of that transaction, the Opatuts constituted the Trustees of the Colonial ESOP.

The second lease by the Opatut brothers of an egg production facility involved Country Fresh Egg Farms. The Opatuts borrowed some $475,000 from the federal Agriculture Production Credit Association in order to finance the construction of facilities at Country Fresh Egg Farm. Thereafter that farm was leased to Rite-Diet. Neither Rite-Diet nor Colonial could qualify for loans from the Agriculture Production Credit Association; financing from that source was materially cheaper than commercially available financing.

The third lease to the company of an egg production facility involved Morning Glow Farm. It occupied land purchased by the Opatuts for their own account in 1976 and 1977. With financing from the Agriculture Production Credit Association, the Opatuts constructed improvements on the land to fit it for egg production. The resulting farm was leased to Colonial or its Rite-Diet subsidiary.

Each of these transactions was alleged in the derivative litigation to be on terms favorable to the Opatuts and to constitute a breach of duty, including the usurpation of a corporate opportunity.

In addition, throughout the mid-1970's the Opatuts purchased hens and feed from Colonial and sold eggs to Colonial. These purchases apparently aggregated $6,966,141 in value and the sales to Colonial aggregated $8,621,185.

Apparently unrelated to the business of egg production or distribution, the Opatut brothers also during this period caused Colonial to engage in certain transactions with American Planned Communities, Inc., ("APC"), a company controlled by the Opatuts. APC, a Delaware corporation, was formed in 1971 as a wholly-owned subsidiary of Colonial. It owned real estate located in New Jersey. It appears (the Stipulation of Facts not being in all respects a model of clarity) that in 1972 the Opatut brothers conveyed certain additional lands to APC in exchange for stock in APC and Colonial then spun off to its shareholders its shares in APC together with certain warrants. As a result, APC assumed the status of a free-standing corporation in which the Opatut brothers owned a greater proportion of the common stock than they did in Colonial. During the relevant period APC lost money and by May 31, 1979 it had a deficit net worth of $1,354,510. Colonial extended loans to APC in 1974 and 1975. In 1976 APC was indebted to Colonial in the amount of $399,378 and to Colonial's profit sharing trust in the sum of $460,692. On July 30, 1976 the Opatuts caused Colonial to purchase a tract of APC's New Jersey land for a total price of $1,117,425.

The benefits of ownership of Colonial's stock to its public shareholders appear to have been minimal. Dividends were infrequent and small; stock appreciation for those who purchased from the initial public offering, non-existent (see note 2, *infra*). Colonial's audited financial statements disclose the following for the years 1974 through 1978:

| Year | Net Sales | Net Income | Dividend Per Share | Book Value Per Share |
|------|-----------|-----------|--------------------|----------------------|
| 1974 | $29,620,000 | 67,000 | –0 | |
| 1975 | 31,834,000 | 693,000 | –0 | |
| 1976 | 42,024,000 | 1,615,000 | .10 | |
| 1977 | 44,437,100 | 122,000 | .10 | 6.50 |
| 1978 | 42,467,434 | 174,000 | –0 | 5.82 |

On December 31, 1976 the three Opatut brothers were each awarded a bonus of $175,000 and defendant Culley and Abraham Opatut were each awarded a $25,000 bonus. It has been alleged that during this period Colonial made contributions to an ESOP for the benefit of the Opatuts in the amount of $458,903.

2. *The Derivative Litigation and Its Termination*

The foregoing facts do not of themselves establish any breach of duty by defendants. They do, however, present a situation under Delaware law in which self-interested directors may justifiably be required to come forward to establish the entire fairness to Colonial and its shareholders of the transactions involved. In October, 1977, shareholders of Colonial instituted suit on behalf of the company in the Superior Court of New Jersey, Chancery Division, in effect making that demand. In September, 1978, notice of the pendency of the New Jersey derivative suit was sent to all shareholders of Colonial, and thereafter some 56 of the then 200 shareholders of Colonial joined the action as plaintiffs.

The New Jersey action proceeded slowly. That Court stated "[the action] was complicated by the confusing nature of plaintiff's allegations and the technical and manipulative efforts on the part of the corporation to avoid the progress of any suit [sic] and to delay a trial on the merits ... After many court hours of argument and after many papers being filed, the point was

finally reached where the matter might be tried on the merits." *Blum v. Opatut,* N.J.Super.–Ch.Div., C.A. No. C–561–77 (December 26, 1979). Before that trial could be held, however, the controlling shareholders of Colonial elected to eliminate the minority shareholders' position in the company. It was decided this would be done through a tender offer followed by a cash-out merger. Thus, on December 11, 1978, a tender offer was made by a newly formed entity (Jobemo Corporation) controlled by the Opatut brothers, to purchase for cash any and all outstanding shares of common stock of Colonial at $3 per share. The tender offer document stated the purpose of the offer as follows:

> The purpose of the offer is for the purchaser to acquire all of the outstanding shares of the company so that potential conflicts of interest arising from transactions which the Opatut brothers believe are necessary for the successful conduct of the business of the company can be eliminated.

Under the heading "Elimination of Potential Conflicts of Interest", the offering document, after briefly sketching the company's reasons for entering into some of the self-dealing transactions attacked in the derivative litigation, stated as follows:

> In November of 1977 the Opatut brothers were named as defendants in an action pending in the Superior Court of the State of New Jersey, Chancery Division.... That action seeks to recover from the individual defendants for the benefit of the company certain sums of money allegedly obtained by them through abuses of their powers as controlling persons of the company. The action also seeks to set aside and rescind the series of transactions....

> The action challenges the business judgment of the Opatut brothers in determining the necessary course of action to achieve the future success of the company, and serve their own best interests. The Opatut brothers believe that if the Opatut family owns all of the shares of common stock of the company, the possibility of conflicts of interest will be eliminated. In addition, if the farm leases are set aside, as the plaintiff demands, the existing institutional mortgages on the farms will be in default. If a foreclosure follows, the company would be deprived of the use of the farms and the Opatut brothers would be obligated to pay the unpaid mortgage indebtedness. The company and the Opatut brothers have already incurred significant legal expenses in the defense of the action and will be required to incur further expenses and devote significant amounts of time to appearing at depositions and trial before it is concluded. It is the belief of the Opatut brothers that the expenditure of such money and time will be detrimental to the business of the company and to their own business and property interests.

> Furthermore, in view of the fact that any damage award would enhance the value of all company shares equally, the Opatut family which already owns 75% of the company's shares would be the principal beneficiary of such award. Moreover, under applicable law, any such award would be reduced by the amount of the fee paid to the attorneys for the complaining stockholders for producing a result which the Opatut brothers regard as inimical to the best interests of the company. In order to avoid this anomalous consequence, they have decided to make this offer.

The $3 offering price was arrived at by defendants unilaterally without independent advice from any source. Principal reliance was apparently placed upon the market price for Colonial stock over the preceding several years.[2] The offering

---

**2.** During the year 1976 the thin market in Colonial stock had registered a high bid of $3\frac{3}{4}$ and a low bid of $\frac{1}{4}$; during 1977 the high bid had been $3\frac{1}{2}$ and the low bid $1\frac{1}{2}$. The most recent-ly quoted bid for the company's stock had been placed in the second quarter of 1978 at $1\frac{1}{2}$. It is noteworthy that during 1976 when Colonial earned net income after taxes of $2.56 per

document reported the book value of the company's common stock as of September 30, 1978, to be $5.82.

As a result of the Opatut's tender offer, approximately 30,000 of the 140,000 shares of Colonial held by the public were tendered and the Opatut's stock interest was increased from approximately 75% to 80% of the 560,658 shares outstanding.

Thereafter, on June 13, 1979, the defendants' entity, Jobemo, was merged into Colonial pursuant to the provisions of Section 228 and 251 of our general corporation law. In that merger, each share of Colonial common stock owned by a person holding less than 10,000 such shares, (i.e., all of the public shareholders) was converted into a right to receive $3 cash per share. The information statement sent to the public shareholders apprising them of the action taken characterized the purpose of the merger in a fashion similar to the statements in the tender offer document quoted above.

Following effectuation of the merger and the filing of this action attacking its validity under Delaware law, defendants moved to dismiss the then pending derivative suit. It was argued that the claims derivatively asserted, as assets of Colonial, had passed to Jobemo as a result of the merger and plaintiffs in that action, as former shareholders, no longer had any interest in any recovery on them. The New Jersey Chancery Division declined to grant that motion, but on appeal the Appellate Division reversed. In disposing of defendants' motion the New Jersey Court took notice of the pendency of this action challenging the validity of the merger and quoted the following language from *Bokat v. Getty Oil Co.*, Del.Supr., 262 A.2d 246 (1970):

... If a proposed merger is sought to be used for the cover-up of wrongful acts of management, a court of equity in an action making a direct attack on the merger can and will protect the innocent stockholder victim. Courts of equity uniformly have used their broad powers to prevent fraud by corporate management when those powers are properly invoked.

The New Jersey Appeals Court then went on to justify its reversal on the following ground:

A minority stockholder will not be left without remedies. If the merger was fraudulent, it can be overturned; if it was proper but the price paid for minority shares was inadequate, it can be adjusted. These remedies are in fact being pursued with respect to the Colonial merger in the federal and state court suits in Delaware. However, pending disposition of thereof, plaintiff no longer has stockholder standing to maintain the present action.

The Delaware federal court action referred to has been stayed pending the outcome of this litigation. This matter has been duly certified as a class action and, after significant discovery, the parties have negotiated a statement of stipulated facts, submitted further factual affidavits and presented the case for decision on the pending cross motions for summary judgment.

## II

These motions present the question whether the undisputed facts of this case demonstrate that defendants—who elected unilaterally to terminate the continuing stock interest of the public shareholders in Colonial—have satisfied their obligation in the circumstances to do so only on terms and in a manner that is fully fair. *Weinberger v. UOP*, Del.Supr., 457 A.2d 701 (1983). This inquiry, central to every challenge to a cash-out merger, cannot be resolved by reference to any radiant legal generalities, but rather calls for a highly specific analysis of the particular facts and circumstances present. *Rabkin v. Philip*

---

share, its stock in the fourth quarter had a high bid of 2½ and a low of 2. In part that price earning ratio may reflect the market's forecast of the company's future prospects, but no doubt in part it also reflected the fact that the defendants, even in years when Colonial made substantial profits, elected to pay minimal dividends. (*See*, p. 8, *supra*.)

*A. Hunt Chemical Corporation*, Del. Supr., 498 A.2d 1099, 1104 (1985).

In analyzing the legal effect of the undisputed facts, I start with two observations. First, it is fair to say that those facts establish that a principal purpose of the merger complained of was to eliminate the standing of the plaintiffs who were pressing, on behalf of the corporation, claims of mismanagement and breach of duty against the defendants in this action. The cash-out merger was intended as a device to terminate the pending derivative action and was effective for that purpose.[3]

Second, for purposes of these motions, I do not necessarily equate the fact that the merger complained of was accomplished for the purpose of terminating the derivative litigation with bad faith or a *per se* breach of fiduciary duty on the part of defendants. Base motivations in these circumstances are, of course, possible, but I need not now (and on a motion of this kind I ought not) determine such an elusive fact as *bona fides*. Thus, for purposes of determining these motions, I assume that defendants believed that the claims asserted in the derivative suit were in fact without merit and that their prosecution would therefore pointlessly drain Colonial's limited financial resources and unproductively divert limited management talent from the management of the enterprise. Finally, I assume for purposes of these motions that the defendants believed $3 per share was a

fully fair price for the minority shares of Colonial.

Accordingly, I decide the pending motions predicated upon the factual premise that a principal purpose of the challenged merger was the termination of the then pending derivative claims brought on behalf of Colonial, that in the circumstances, such a motive itself does not constitute a *per se* breach of duty by controlling shareholders, and upon the assumption that the controlling shareholders acted in good faith and for reasons they believed to be in Colonial's best interest in effectuating the merger. Despite these premises and assumptions, however, I conclude that defendants have not in fact proceeded in a way that assured fair treatment to those whom they elected to remove as shareholders of Colonial. This, in the circumstances, they were required to do and that failure establishes a breach of their fiduciary duty requiring the denial of defendants motion for summary judgment and the granting of plaintiff's motion for partial summary judgment.

### III

This case involves the appropriateness of the technique employed by the defendants to terminate judicial review of the propriety of self-dealing transactions. Self-dealing transactions by corporate officers, directors or controlling shareholders

---

3. That the New Jersey Court was correct in dismissing the derivative suit once the merger had in fact been accomplished—even though the merger was motivated in principal part to obtain that result—is a proposition as to which I have no doubt. Once the public shareholders were removed as shareholders in Colonial, they no longer possessed any financial interest in any recovery that Colonial might have been able to achieve on the claims pressed, either by way of settlement or litigation. How then could such former shareholders thereafter continue as appropriate representatives of the new owner of the claims? And, as a practical matter, how would litigation with such an antagonist who had no financial stake in the outcome of the litigation be conducted and for what purposes? For these reasons, the general rule in Delaware is that a cash-out merger will terminate the standing of a plaintiff to continue to maintain derivative claims on behalf of the corporation of which he was (but no longer is) a shareholder. *Lewis v. Anderson*, Del.Supr., 477 A.2d 1040 (1984). Despite contrary dicta in some Delaware cases (*see*, *Bonime v. Biaggini*, Del.Supr., 505 A.2d 451 (1985) (Order); *Rosen v. Navarre*, Del.Ch., C.A. 7098 (October 29, 1985) (Hartnett, V.C.) it seems apparent to me that the rule of *Anderson* should apply even where the purpose of the cash-out merger is to cause a premature termination of derivative litigation. The logic of the derivative form of action compels that result and to recognize that fact judicially does not—as the holding in this case illustrates, *see* p. 766, *infra*—permit self-dealing fiduciaries inappropriately to avoid their duty to account to minority shareholders.

are not prohibited by Delaware law. Indeed, our statute provides specific special procedures that may be employed to remove the taint that any such transaction may possess solely by reason of its self-interested character. *See* 8 *Del.C.* § 144. However, whenever a controlling shareholder sets out to exercise his power to set the terms of such a transaction and compel its effectuation, he assumes a new and significant responsibility: the burden of establishing to an independent body, whether a court in litigation, an independent committee of the board under § 144(a)(1), or disinterested ratifying shareholders on full and complete information,[1] that the transaction is fully fair.[5] In all events, should a reviewing court be required to pass upon the fairness of such a transaction, the self-dealing fiduciary may be required to respond in damages or with another appropriate remedy if the transaction, despite any good faith on his part, is found to be not an entirely fair one to the corporation or to minority shareholders, as the case may be.

In this instance, defendants, by acting to effectuate the challenged merger, have avoided their responsibility to justify the entire fairness of the myriad self-dealing transactions challenged in the New Jersey litigation. Thus, this matter necessarily implicates the principles that govern when and under what circumstances a corporation may act unilaterally to terminate judicial review of transactions challenged as constituting a breach of a director's fiduciary duty.

Our case law recognizes that a necessary part of the responsibility of a board of directors in managing the business and affairs of a corporation includes decisions concerning when and in what manner litigable claims possessed by the corporation should be judicially pressed. *See, Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984);

*Zapata Corporation v. Maldonado,* Del. Supr., 430 A.2d 779 (1981). This principle which seems utterly noncontroversial when, for example, suit on a trade receivable is involved, has a more delicate role where the corporate claim is one against directors or controlling shareholders. Even in that instance, however, our law recognizes that an objective evaluation of the corporation's best interests might counsel restraint in pressing such claims where, for example, the claims themselves are weak or ill-founded and their litigation might involve destruction of important relationships or impairment of management functions. Recognizing this reality, the Delaware law establishes a technique by which those charged with the management of a corporation may unilaterally instigate the termination of derivative litigation that it is not in the corporation's interests to pursue. *See, Zapata Corporation v. Maldonado, supra.* That technique mimics Section 144's reliance upon the force of an informed, independent judgment. When followed it protects the legitimate corporate interest by requiring an independent, disinterested committee of the board to make a determination that litigation ought not be pursued. It provides as well the additional safeguard of judicial review of that determination. *See, Lewis v. Fuqua,* Del.Ch., 502 A.2d 962 (1985).

This judicially approved method for the termination of derivative litigation through unilateral corporate action provides clear guidance to corporate management. The facts of this case, however, arose before the specific guidance provided by *Maldonado* was available. In this instance, an alternative technique to effectuate a termination of derivative litigation was employed. That technique, the cash-out merger, was effective. *See, Blum v. Colonial*

---

4. *See, e.g., Michaelson v. Duncan,* Del.Supr., 407 A.2d 211, 224 (1979); *Gottlieb v. Heyden Chemical Corporation,* Del.Supr., 90 A.2d 660 (1952).

5. Of course, the effect of meeting this burden will vary depending upon whether it is a court or an intra-corporate agency that affirms the

transaction. In the latter instance the effect is simply to shift the burden in any subsequent judicial challenge of the fairness of the transaction to those attacking it. *See, Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218 (1976).

*Foods Corporation*, N.J.Super–App.Div., A–2751–9 (September 29, 1980).

 In the light of the broad powers and responsibilities conferred on the board of directors by Section 141(a) of the General Corporation Law and of the fundamental preference for flexibility expressed in our corporation law by the doctrine of independent legal significance,[6] I cannot say that a merger effectuated for the purpose of terminating pending derivative litigation constituted a *per se* violation of the fiduciary duty that controlling shareholders owe to minority shareholders. While the *Maldonado* case sets out an appropriate technique for a board, in the context of pending derivative litigation, to exercise its Section 141(a) power to manage the corporation and its business, the doctrine of independent legal significance suggests that that technique may not be the only available way for a board to approach a result it deems in the corporation's interest. What is inflexible in our corporate law is the requirement that self-dealing fiduciaries deal with the corporation and its shareholders only on terms that are entirely fair. Accordingly, only where there exists a basis for a reviewing court to conclude that this supervening equitable obligation has been satisfied and that therefore a cash-out merger effectuated for the purpose of terminating pending derivative litigation does not constitute a breach of trust, will a cash-out merger provide an appropriate alternative to the *Maldonado* procedure.

 Under the *Maldonado* procedure, the exercise of judgment by a body of truly disinterested directors, when made after due consideration and in good faith, supplies such a basis. This case provides no similar or analogous basis; that is it affords no ground upon which the defendants could or a reviewing court may dependably conclude that the termination of the deriva-

tive litigation sought by the merger was in the best interest of the corporation and was not simply in the interest of the directors and controlling shareholders who had been charged with wrongdoing. Without the guidance of a truly independent judgment, self-interested directors cannot with confidance know the right course in order to pursue it. In all events, the law, sensitive to the weakness of human nature and alert to the ever-present inclination to rationalize as right that which is merely beneficial, will accord scant weight to the subjective judgment of an interested director concerning the fairness of transactions that benefits him. *Gottlieb v. Heyden Chemical Corporation*, Del.Supr., 33 Del.Ch. 82, 90 A.2d 660, 663 (1952).

Fair dealing in these circumstances required not reliance on such frail support as the defendants' own evaluation of their innocence of wrongdoing and of the fairness of their unilaterally determined cash-out price. Rather, at a minimum, what was required in this instance was a disinterested judgment that litigation of the claims asserted derivatively was not in Colonial's best interests and an unbiased and expert view of the value of those claims. Such a requirement should come as no surprise to any director who earnestly asked himself what, given his own intense and apparent conflict of interest, fairness required.

 I conclude that the cash-out merger challenged in this litigation constituted a breach of the defendants' duty of fair dealing because (1) it was effectuated for the purpose of precluding the public shareholders from requiring the defendants to account for the self-dealing transactions in which those fiduciaries had elected to engage, and (2) because the merger was effectuated by a process that supplied no dependable basis to conclude in fact (a) that

---

**6.** That doctrine has been most succinctly stated in *Orzek v. Englehart*, Del.Supr., 195 A.2d 375, 378 (1963): "The general theory of the Delaware Corporation law is that action taken under one section of that law is legally independent, and its validity is not dependent upon, nor to be

tested by the requirements of other unrelated sections under which the same final result might be obtained by different means." *See also, Field v. Allyn*, Del.Ch., 457 A.2d 1089 (1983), *aff'd*, Del.Supr., 467 A.2d 1274 (1983) (per curiam).

the corporate interest and not simply the personal interests of the defendants was served by the termination of the derivative litigation and (b) that the merger price was fair considering the value of the then pending derivative claims to the corporation. This combination of factors leads me inescapably to conclude that the defendants did not, in this instance, meet the special obligations that the law places upon them when they elect to engage in self-dealing transactions. *See, Weinberger v. UOP*, Del.Supr., 457 A.2d 701 (1983); *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952).

## IV

In the relief phase of this class-action litigation, plaintiffs will be free to introduce evidence relating to the fairness of the $3 cash-out price. That evidence may permissibly relate to the value (and thus the validity) of the claims previously asserted in the derivative litigation. As assets of Colonial those claims constitute one ingredient of the value to which the class had a proportionate right. Thus, in the setting of a class action suit challenging the entire fairness of the cash-out merger, those derivative claims may still be litigated; now, however, by reason of the merger they will not be evaluated as derivative claims but rather, indirectly, as evidence relevant to the fairness of the cash-out price. While the Court does not look upon the graceless creature of a suit within a suit with warm approval, this result seems dictated by the logic of the derivative form of action and the requirement that fiduciaries establish the entire fairness of their business dealings with the corporation to which they owe a duty of loyalty.[7]

For the foregoing reasons, defendants' motion for summary judgment will be denied and plaintiff's motion for partial summary judgment on the issue of liability will be granted.

It is so ordered.

---

**7.** I note, for the guidance of the parties, that disposition of the pending motions has not required me to make any judgment concerning the fairness of the $3 per share merger price. It may be that such price fully reflected the fair value of the minority shares even when a proportionate share of any value the derivative claims may have had is considered. That determination cannot be made on this record. However, were that ultimately to be found to be the case, one available remedy would be the award of nominal damages to the class. Even in that case, however, other alternative remedies may be available; but that is a subject that need not now be addressed.