OLSON BROTHERS, INC.,
Plaintiff,

*vs.*

OTTO T. ENGLEHART, PAUL O. SUMMERS, ANGELO F BALDINI, WILLIAM B. O'CONNELL, JOHN PAUL STEVENS, DILLON GEIGER, C. C. JERDEN, JOHN CLARK, and Y. FRANK FREEMAN, JR.,
Defendants.

*New Castle, June 23, 1965.*

*Rodney M. Layton,* of Richards, Layton & Finger, Wilmington, for plaintiff.

*David Snellenberg, II,* of Killoran & VanBrunt, Wilmington, for defendant Baldini.

*Irving Morris* and *Joseph A. Rosenthal,* of Cohen & Morris, Wilmington, for remaining defendants.

SHORT, Vice Chancellor : This litigation grows out of a change of management of Olson Brothers, Inc., formerly Bellanca Corporation (Bellanca), a Delaware corporation. The complaint challenges the validity of stock options granted to defendants, former members of the board of directors. The options were authorized by resolution of the board on June 22, 1960, and, as amended in April 1961, were approved by stockholders on June 2, 1961. This is the decision after final hearing.

The history of Bellanca is well known in legal circles. The corporation has been a frequent litigant in the courts of this state and elsewhere. For purposes of the present case it is only necessary to refer to the situation of Bellanca as it existed near the end of the year 1958. Its then condition has been referred to as an "empty shell." *Orzeck v. Englehart,* 41 *Del.Ch.* 361, 195 *A.2d* 375. It was in ill repute in the financial world and had, in fact, been delisted by the American Stock Exchange. It was then engaged in defending some 19 suits representing claims for millions of dollars. Its sole operations were in the used rubber machinery business in which it was losing money. A receivership proceeding had been instituted against it. The tasks which it then faced were the liquidation of its remaining physical assets, reduction of expenses, defense of litigation and the finding of an acquisition in which to lodge its tax loss, which, if allowed, would amount to between seven and eight million dollars. In 1958, upon the solicitation of George N. Craig, attorney for the stockholders who had instituted the receivership proceeding, Bellanca acquired a new board of directors which included defendants Jerden, O'Connell, Geiger, Stevens and Summers. Defendants Clark and Englehart went on the board in 1959 and defendants Baldini and Freeman in 1960. Mention of options for directors was made by Craig to defendants Englehart, Jerden, O'Connell and Geiger prior to their coming on the board. Baldini was invited to serve by Englehart with the assurance that options would be granted. All of the directors were men of prominence in their respective fields, but none was experienced as a business broker or finder.

By the close of 1958 Bellanca had disposed of its used rubber machinery business and thereafter, until its acquisition of the Olson Brothers' companies in 1961, engaged in no business activities. On April 24, 1959 the board appointed a committee to investigate the question of stock options for officers and directors. This committee had no formal meetings but one of its members drafted a memorandum recommending the grant of options for 60,000 shares to Englehart, the president of the corporation, 60,000 shares to its general counsel, and 30,000 shares to each of its directors, including the members of the option committee. On June 22, 1960 a meeting of the board, upon notice, was held in Chicago. At this meeting attended by

Englehart, Baldini, O'Connell, Stevens and Jerden, resolutions were adopted granting stock options of 60,000 shares to Englehart and 20,000 to each other director at an option price of $1 per share, that being the par value of the stock. The resolution for Englehart, Summers and Baldini, they being the officer-directors of the corporation, provided for "exercise of the rights granted thereunder for a period of five (5) years provided said officers remain with the corporation during said period * * *." The resolution for the other directors provided for "exercise for such period as they are directors, but not exceeding a period of five years from June 22, 1960 * * *." The resolutions called for submission to stockholders for approval "but that said options shall be operative in the meantime."

During the time that defendants served upon the board prior to June 22, 1960, the president had devoted considerable time to investigating possible acquisitions by the corporation in which it could lodge its substantial tax loss. Many possible acquisitions or mergers had been brought to the attention of Englehart by finders and other persons. Some of these were investigated; others were not. All were rejected for one reason or another.

At the meeting of the board on June 22, 1960, a professional finder, Morris Sullivan, was interviewed with the idea of retaining his services to find an acquisition or merger for the company. This interview resulted in an exclusive contract being made with Sullivan to find a profitable association. In April 1961 Sullivan brought to the corporation a possible acquisition of seven corporations owned by H. Glenn Olson and C. Dean Olson (Olson brothers) which were engaged in the egg business in California. Negotiations were entered into with the Olsons and culminated in the purchase by Bellanca of the seven Olson companies. At a meeting of the board on April 5, 1961, during which the acquisition of the Olson companies was first discussed, the option resolutions of June 22, 1960 were amended by deleting the requirement that the officer-optionees "remain with the corporation" and the condition as to non-officer-optionees that they be directors at the time of their exercise of the options. Up to that time no approval by the stockholders of the resolutions of June 22, 1960 had been sought by the directors, nor had any director attempted to

exercise his option. On April 25, 1961 the last meeting of the old Bellanca board was held. At that meeting the option resolutions of June 22, 1960, as amended by the resolutions of April 5, 1961, were further amended to provide for option grants of 20,000 shares each for a period of two years after April 25, 1961 to those persons who were directors on April 24, 1961, "provided such options are approved by the stockholders."

The transaction with the Olson brothers was approved by the Bellanca board on April 26, 1961. During the course of the negotiations the Olsons expressed concern about the options. When however, the board agreed to reduce the total option number by 40,000, the Olsons agreed that they would not object to the options provided the stockholders approved them. Such approval was given at the annual meeting held on June 2, 1961 by a vote of 710,996 to 54,066. The Olsons did not vote their shares at the stockholders' meeting. Neither did they raise any question as to the validity of the options, though their testimony indicates that they then recognized the possibility that the options might be invalid.

On June 2, 1961, following the stockholders' meeting the new board of Bellanca, consisting of nominees of both the old and new management, met and directed the preparation of appropriate documents to effectuate the options. This direction was never carried out and demands for options by certain members of the old board were rejected. This litigation ensued.

The standards by which the validity of all stock option plans must be tested have been settled by the Supreme Court. The leading cases are *Kerbs v. California Eastern Airways, Inc.*, 33 *Del.Ch.* 69, 90 *A.2d* 652, 34 *A.L.R.2d* 839, *Gottlieb v. Heyden Chemical Corporation*, 33 *Del.Ch.* 82, 90 *A.2d* 660, 663 and, on reargument, 33 *Del.Ch.* 177, 91 *A.2d* 57, and *Beard v. Elster*, 39 *Del.Ch.* 153, 160 *A.2d* 731. The principles established by these cases may be generally stated as follows: Each stock option plan must be tested against the requirement that it contains conditions, or that surrounding circumstances are such, that the corporation may reasonably expect to receive the contemplated benefit from the grant of the

options, and there must be a reasonable relationship between the value of the benefits passing to the corporation and the value of the options granted. While the sufficiency of the conditions or surrounding circumstances to insure to the corporation that it will receive the contemplated benefit may vary in each case, there must be some element which can reasonably be expected to lead to the desired end. Where, as here, there is stockholder ratification of the plan the burden of proof is on the objector to convince the court that no person of ordinary sound business judgment would be expected to entertain the view that the consideration furnished by the directors is a fair exchange for the options conferred. These general principles are easily stated. However, it is often difficult to apply them to particular facts. Their application to the present factual situation is made more difficult because the case presented is unique in the field of stock option cases. We are not here dealing with a corporation which is actively engaged in one or more business enterprises. Rather are we concerned with a derelict corporation, bereft of all the incidents of a going concern, whose rehabilitation could only be accomplished by the finding of an association in which to lodge its tax loss carryover which had accumulated over the years. In the case of a going concern it might well be doubted that the grant of stock options to directors for services ordinarily coming within the field of their duties could be justified. This is particularly so where, as here, the directors, by authority of appropriate provisions of the by-laws, are compensated for attendance at directors' meetings, and, with respect to one of their number who is the president of the corporation, a substantial salary is paid for his services as such officer. Whether or not the uniqueness of the facts here presented warrants a different result is the issue for determination.

Of all the stock option cases which have been before the courts of this state the Kerbs case most closely resembles the present on its facts. In Kerbs the corporation concerned was, by the end of 1947, in a precarious financial position. Under new management the corporation's operations thereafter became profitable and showed a substantial profit for the year 1950. In October of that year the directors adopted a stock option plan which would benefit a majority of their number. At a special meeting of the stockholders called for that pur-

pose the plan was ratified by a majority of the stock. The plan provided options to purchase stock at the price of $1 per share which was the approximate market price at the time of the adoption of the plan. Each option was exerciseable, in whole or in part, at any time for a period of five years but not later than six months after the termination of the employment of the optionee to whom it was issued. The Supreme Court held the plan defective in that it was not reasonably calculated to insure that the corporation would receive the contemplated benefits. It was urged that the fact that the options might be exercised only while the optionee remained in the employ of the corporation insured that the corporation would receive the contemplated benefit, that is, the retention of the optionee's services. The court, in rejecting this argument, pointed out that by the terms of the plan the options might be exercised *in toto* immediately upon their issuance and might be exercised within a six month period after the termination of employment. The court also held that there was no showing of surrounding circumstances which would insure that the contemplated benefit would be received.

While the facts of the Kerbs case bear resemblance to the present they differ in many material respects. At the time of the adoption and ratification of the plan in Kerbs the corporation was operating as a profitable enterprise. Here, on the contrary, at the time of the adoption of the plan Bellanca had no business operations, its sole important task being the lodgement of its tax loss carryover in some going enterprise. In Kerbs the option price was fixed at the then approximate market price, though it would appear from the fact that the price rose sharply within a period of less than two months that a rise was anticipated. Here, the option price was set at $1 per share, the par value, and at the time of the adoption of the plan the stock was selling on the market at approximately 50¢ per share with little, and probably no prospect of any increase unless the sole task confronting the directors was accomplished. In Kerbs the terms of the plan provided that the option was exercisable, in whole or in part, at any time within five years but not later than six months after the termination of employment. The Bellanca plan provided for exercise of the options during the period when the optionees were in the service of Bellanca,

either as officers or directors.[1] In Kerbs the court found no surrounding circumstances which could be considered as reasonably insuring that the corporation would receive the benefit contemplated by the grant of options. Here, there are circumstances which point to a reasonable assurance that the contemplated benefit, namely, the retention of the services of the optionees as directors, would be received. Not only had some of the directors been assured of options prior to their coming on the board of Bellanca but it appears that some of them had in fact threatened to resign prior to June 22, 1960. The option resolution was, therefore, designed to keep intact a board of directors whose service to Bellanca had resulted in the rehabilitation of its corporate image and whose continued service would conduce prospective associates of Bellanca to deal with confidence. Another object was, of course, to provide added incentive to accomplish the one task which called for the directors' services. That these objectives were attained is clear. All of the directors continued in service until the consummation of the Olson brothers transaction which, as the result of hard bargaining by the directors, was upon terms substantially more favorable to Bellanca and its stockholders than were first offered by the Olsons.

■ Plaintiff advances several arguments against the conclusion that Bellanca, in the circumstances, was reasonably assured of receiving the contemplated benefit from the grant of the options. It contends that the options were granted, in part, for past services performed by the directors. While there is testimony in the record which refers to past services of the directors, I am satisfied that the intention of the directors in voting the grant of options at the meeting of the board on June 22, 1960 was prospective in nature, designed to continue the directors in the service of the corporation and to supply added incentive in the performance of future services. For the same reason plaintiff's contention that the options were voted "as payment pur-

1. While the resolution of June 22, 1960 used somewhat different language with respect to the exercise of options by officer-directors from that use with respect to other or "outside" directors, no point of this difference is made by the parties. Since the amendatory resolution of April 25, 1961 referred to option grants to directors only no distinction will be drawn between the separate resolutions of June 22, 1960.

suant to an implied * * * contract arising out of Craig's representations" assuring options to certain of the defendants is inappropriate. The promise of options to certain directors was merely a circumstance which the court may consider, and this regardless of whether Craig had authority to bind the corporation.

Plaintiff contends that the fact that the resolutions of June 22, 1960, although calling for approval by the stockholders, were made "operative in the meantime" brings them within the condemnation of the Kerbs case where the plan permitted directors "to leave the company's employ and, yet, have the right to exercise their options for six months thereafter." The testimony indicates that the reason for making the options "operative in the meantime" was to fix the date of June 22, 1960 for federal income tax purposes. If this were the only circumstance to consider it may well be that the plan could not be said to provide "reasonable safeguards that the corporation would receive the contemplated benefit." But as already observed, in the plan before the court in the Kerbs case the option price was fixed at the then market value of the stock though a sharp increase was in all probability contemplated. The option price here was approximately double the market value of Bellanca shares on June 22, 1960 with little prospect of any price increase. To disregard the disparity between the exercise price and the market price of Bellanca shares would be unrealistic. Certainly on June 22, 1960 no one could prophesy whether Bellanca would ever find a profitable association. For any of the directors to have then, or at any time prior to April 1961, exercised his option would have been pure speculation, if not foolhardy. Moreover, from the point of view of hindsight, which was recognized in *Beard v. Elster, supra,* it is to be observed that all of the directors remained in the service of Bellanca until its sole task was accomplished.

Plaintiff next contends that the resolution of April 5, 1961, which removed the requirement of continued service as a condition to option rights, so affected the plan as to show conclusively that the retention of defendants' services was not reasonably assured to Bellanca. Plaintiff points to the fact that the amendatory resolution was, according to the minutes, the first order of business at the April 5 meeting. At that time, plaintiff says, there had been no discussion of the Olson broth-

ers' transaction and it could not then have been known whether a satisfactory agreement with the Olsons could be reached. I attribute little significance to the fact that the amendment was the first order of business. The minutes disclose that later during the same meeting discussions were had with one of the Olsons. The directors had always recognized that if and when an acquisition or merger was found one or more of their number would be required to resign in order to place upon the board nominees of such corporation as Bellanca might acquire. Thus, in anticipation of a successful transaction with the Olson brothers, and knowing that the Olsons would demand representation upon the board, the directors adopted the resolution of April 5. The important fact here is that the transaction with the Olsons was successful and its consummation required five members of the board to resign. The resolution of April 25, 1961, which shortened the exercise period of two years and also omitted any requirement of future service by the directors, was the result of bargaining with the Olsons. I do not regard it as having any peculiar significance.

■ Plaintiff further contends that in the circumstances presented Bellanca had no need for the retention of defendants' services. It argues that since Bellanca's sole important task was the lodgement of its tax loss in a profitable operating enterprise, the corporation was required to maintain no more than a skeletal management replacements of which could have been supplied by the stockholders at any time as required. This argument is contrary to the spirit of the *General Corporation Law,* Chap. 1, *Title* 8, *Del.C.* Section 141 of Title 8 provides that the business of every corporation "shall be managed by a board of directors." Whether that business consists of the operations of the usual going concern or, as here, but a single task, the corporation requires management, that is, a board of directors and such officers as may be necessary to accomplish its purpose or purposes. Moreover, apart from any question of options it was the considered judgment of the board that in order to attract a profitable association the continued presentation of a favorable image for Bellanca was required.

■ I am satisfied that the circumstances here presented were such as to reasonably insure to Bellanca that it would receive the ben-

efit contemplated in return for the grant of options. Having thus concluded I must now consider whether there is a reasonable relationship between the value of the benefits passing to the corporation and the value of the options granted.

Plaintiff contends that since Bellanca was not engaged in business as a going concern its requirement for services lay in a single field, that of the business broker, and since no member of the board had any expertise in that field, the services of the defendants may not be regarded as of any benefit to the corporation. Plaintiff suggests that the board should have sought the services of a broker long prior to the date of the option resolution. This contention loses sight of the fact that many prospects had been brought to the attention of Bellanca by a number of finders, including Morris Sullivan. The fact that defendants had only been called upon to consider prospects on a few occasions does not, as plaintiff would indicate, show that the directors were in any way lax in their duties in not sooner seeking the exclusive services of a professional finder. Englehart, the president and a director, did consider many prospects and brought to the attention of the board those which seemed promising. Even though there may have been delay in engaging the services of a professional finder, the fact is that a finder was engaged and a profitable association brought to Bellanca. In spite of plaintiff's efforts to belittle the services which defendants rendered, the record amply demonstrates that the members of the board did perform services which were valuable to the corporation and its stockholders. The acquisition of the Olson brothers' companies brought almost immediately a substantial increase in the value of Bellanca's shares. It converted what had for years been a losing operation into a successful enterprise.

Plaintiff argues that there was no evaluation of the services performed by the defendants and points to the fact that options in equal amounts were granted to each member of the board. At the same time plaintiff admits that there was no way to make any differential evaluation. By this very admission plaintiff answers its own contention. Moreover, the question of evaluation of defendants' services is one of the very issues which this court is called upon to determine.

Plaintiff concedes that the value of the options was speculative and that no fixed value could be placed thereon. It would thus seem to agree with defendants that the value of the options was wholly prospective in nature, dependent entirely upon whether a favorable acquisition was made and the market price thereby driven to a point exceeding the exercise price. In conceding that the value of the options was speculative plaintiff, in my opinion, has put this issue within, as the Supreme Court characterized, "the twilight zone where reasonable businessmen, fully informed, might differ." *Beard v. Elster, supra.* Accordingly plaintiff has failed to show that the value of the services performed by the defendants and the value of the options granted were not the subjects of a fair exchange.

I am satisfied, therefore, that not only did the plan and the surrounding circumstances assure Bellanca of obtaining the benefits sought by the grant of options, but that the value of the services performed by the defendants bore a reasonable relationship to the value of the options granted.

In view of the conclusion reached it is unnecessary to consider defendants' objection to the testimony of the witness Northrup who testified as an expert on behalf of plaintiff. Suffice it to say that in all due deference to the witness I could accord but little weight to his testimony. This is principally because of the uniqueness of the situation presented, a situation which he obviously had not encountered in his experience.

Defendants are entitled to judgment declaring the option resolution of June 22, 1960, as amended by the resolutions of April 5, 1961 and April 25, 1961, valid.

Order on notice.