Richard A. ASH, on behalf of himself and
all similarly situated shareholders of
Brunswick Corporation, Plaintiff,

v.

BRUNSWICK CORPORATION, a Delaware Corporation, et al.,
Defendants.

Civ. A. No. 74-135.

United States District Court,
D. Delaware.

May 27, 1975.

Rodman Ward, Jr., and James L. Holzman, of Prickett, Ward, Burt & Sanders, Wilmington, Del., for plaintiff; Cletus P. Lyman, of Lyman & Ash, Philadelphia, Pa., of counsel.

E. Norman Veasey and Allen M. Terrell, Jr., of Richards, Layton & Finger,

Wilmington, Del., for individual defendants.

Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, Del., for defendant Brunswick Corp.

## OPINION

STEEL, Senior District Judge:

This action was brought by Richard A. Ash, a resident of Pennsylvania, and a stockholder of Brunswick Corporation, a Delaware corporation ("Brunswick"), against Brunswick and certain of its officers and/or directors, none of whom were residents of Delaware or Pennsylvania. The amended complaint (hereinafter "complaint") purports to allege an individual action by plaintiff, a class action on behalf of all similarly situated stockholders of Brunswick, and a derivative action on behalf of the corporation.

The complaint alleges that a proxy statement which was issued by Brunswick in soliciting votes of the shareholders in favor of the "1974 Management Non-Qualified Stock Option Plan", violated section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rules 14a–9 and 14a–3 of the S.E.C. promulgated thereunder,[1] and in addition, that the terms of the plan and the manner of its implementation violated Delaware law. Insofar as the complaint charges defendants with violating the Securities Exchange Act of 1934, the jurisdiction of the Court is based upon Title 15 U.S.C. § 78aa, and insofar as the complaint charges a violation of Delaware law, jurisdiction of the Court rests upon pendent jurisdiction. The complaint seeks to enjoin "all defendants from issuing or assisting in the issuance of any stock or options pursuant to the plan"; to "void any stock or options that may be issued . . . ;" to "[g]rant judgment [for] Brunswick and against the individual defendants for the damages found to have been suffered by Brunswick arising from the option plan"; and to "[g]rant such other and further . . . relief as shall be warranted in the circumstances, together with costs of suit and reasonable attorneys' fees."

The case is before the Court upon motions of the plaintiff for summary judgment as to liability, and for a judicial declaration that the action may be maintained as a class action; and upon the motions of the individual defendants for summary judgment dismissing the action or, failing that, for a determination that it cannot be maintained either as a class action or derivatively. Before the Court are a verified amended complaint, an unverified answer, depositions of some of Brunswick's officers and directors taken by plaintiff, answers of Brunswick to sets of interrogatories, documents produced by Brunswick, and depositions of the plaintiff and his law partner taken by defendants.

■■ The law to be applied in resolving the cross motions for summary judgment is clear. Before plaintiff's motion can be granted there can be no genuine issue of any material fact and plaintiff must be entitled to a judgment as a matter of law. The evidence is not to be balanced to ascertain whether it weighs more heavily in plaintiff's favor than in defendants' but must be examined with a view to determining whether there is any evidence (regardless of whether there may be evidence to the contrary) which, if accepted by a fact finder after trial, would justify a judgment for the defendants. If there is, plaintiff's motion must be denied. The resolution of the defendants' motion for summary judgment requires that the evidence be viewed from precisely the opposite standpoint. If there is any evidence or reasonable inferences to be drawn therefrom which, if accepted by a fact finder after trial would support a judgment in favor of the plaintiff, then

---

1. The complaint also alleges the violation of section 10(b) of the Act, 15 U.S.C. § 78j(b) and Rule 10b–5. Plaintiff, however, has couched his argument solely on the violation of section 14(a) and Rule 14a–9 (PB 27, Doc. 35), and it alone will be considered.

the defendants' motion for summary judgment must be denied.

The plan was given preliminary consideration by the board of directors on September 18, 1973. It was patterned after one adopted by Minnesota Mining & Manufacturing Company, the features of which were generally described at the meeting. Hanigan, the board Chairman, stated that the Brunswick plan which had been adopted in 1968 and was then in effect was not fulfilling its intended objectives. The board generally favored the 3M plan and directed management to prepare and submit a draft to the board.

This was done. The plan, known as the "1974 Management Non-Qualified Stock Option Plan", was upon the recommendation of Abernathy, the President, adopted at the February 19, 1974 meeting, subject to stockholder approval. At the same meeting the directors approved the form of the notice of the 1974 annual meeting of stockholders, the proxy statement, and proxy for use in connection with the meeting. The minutes disclose that the board intended that the plan should supercede the 1968 Qualified Stock Option Plan which had been unsatisfactory because of changes in the tax laws and stock market conditions. The minutes reveal that the purpose of the 1974 plan was to reduce the risks to the optionees, that the plan was thought to be fair to the stockholders because no optionee would gain unless the market price of the stock rose, and that it was beneficial to the corporation because it would entitle the company to tax deductions at the time when the options were exercised. The minutes state that the total cost to the company would be relatively modest in view of the benefits derived from the plan. Because the 1974 plan would involve much less risk to the optionees than the 1968 plan, the board contemplated that the committee administering the plan would grant options to more people than had been granted options under the 1968 plan. The directors designated three of its members, Messrs. Appley, Rinfret and Sevcik, as the committee to administer the plan.

The action taken at the February 19, 1974 board meeting was approved by eight directors. Only two of them, Hanigan and Abernathy, Chairman and President respectively, were employees or officers of the company. The other six were "outside" directors of preeminent business and professional experience and distinction. Only two, Hanigan and Abernathy, were recipients of options which were later granted.

Notice of the 1974 annual meeting of Brunswick stockholders was sent out under date of March 25, 1974, and was accompanied by a proxy statement. Section 14 of the Act required as a condition to the solicitation of proxies that such a statement be sent. Attached to the proxy statement was a copy of the 1974 plan. The proxy statement which accompanied the notice was approved by the board and stated (p. 15–16):

"The continued success of the Corporation and its subsidiaries is based in large part on the skill, energy and commitment of key management personnel. This Plan will be used to provide additional incentive to attract and retain able and experienced personnel for the Corporation and its subsidiaries and will provide increased motivation for personnel to exert added effort towards the Corporation's growth and success by giving them an opportunity to acquire a stake in the Corporation's success. The Board of Directors believes that the 1974 Plan offers the Corporation and its subsidiaries a better opportunity than the 1968 Qualified Stock Option Plan to achieve these goals. Accordingly, even though there are about 188,000 shares presently available for granting future options under the 1968 Plan, no further grants will be made under the 1968 Plan if the stockholders approve the 1974 Plan."

At the stockholders' meeting 14,370,005 shares were voted to ratify

the plan whereas 475,092 voted against ratification (¶ 26, Answer of individual defendants to amended complaint).[2] Of the 17,420,274 shares which were outstanding only 9,000 were beneficially owned by Abernathy and 63,000 by Hanigan to whom options and stockholder appreciation rights were granted (hereafter referred to together as "options"). The record fails to disclose that any of the other stockholders have been the recipients of any options. Thus the plan was adopted by an independent board of directors and was ratified by independent stockholders holding a majority of the stock. This is uncontroverted. No fraud was involved in the adoption of the plan and plaintiff makes no claim to the contrary.

The salient terms of the plan are as follows:

A committee of the board of directors consisting of no less than three members, none of whom should be eligible to participate in the plan, is to determine from time to time the recipients and number of options to be awarded. The committee is authorized to provide for options not to exceed in the aggregate 400,000 shares of the common stock of the corporation. The committee is prohibited from issuing any options to anyone 64 years of age or older.

The options are to have a term of 10 years and are to be exercisable in four equal annual installations, the first on the first anniversary date after issuance, and later installments on each succeeding anniversary date. The option for twenty-five percent of the stock could be exercised on each installment date or later. Recipients of an option have the right to purchase the number of shares specified in the option at an "adjusted option price". This is equal to the closing price of the stock on the New York Stock Exchange on the date

of the granting of the option reduced by any increase in market value of the stock between the date the option is granted and the date it is exercised, with the qualification that the amount of the reduction can not exceed the initial option price.

In addition, the plan authorizes the committee in its discretion to grant "stock appreciation rights" which relate to the specific options which are granted. The stock appreciation rights are exercisable to the extent but only to the extent that the associated option is exercisable. A recipient of a stock appreciation right can elect to surrender the exercisable portion of his option, either in whole or in part, and receive from the company in exchange, without the payment of any cash, the number of shares of stock having an aggregate market value equal to the product of the difference between the market value of one share on the date of surrender and the adjusted option price and the number of shares called for by the option.[3] The company can settle such obligation either in cash or stock or in some combination of cash and stock.

An option terminates on the earliest of the following dates: (1) Ten years after the date the option is granted, (2) three months after the date of the holder's retirement or death, and (3) three months after the date the holder's employment is terminated for any cause other than retirement or death.

The term "retirement" means termination of employment because (i) the holder reaches his or her 65th birthday, (ii) of physical or mental disability, or (iii) of early retirement after age 55 pursuant to the pension plan of the corporation. In the event of an option holder's retirement without his having fully exercised his option he is entitled

---

2. Since defendants' answer is unverified and no reply has been filed or is required, the allegation is deemed denied. Fed.R.Civ.P. 8(d). However, since plaintiff has nowhere denied stockholder ratification of the plan the allegation of ¶ 26 of the amended answer will be accepted as true.

3. This seemingly complex formula is explained later in the opinion.

within three months following the date of his retirement (but not more than 10 years from the date the option is granted) to exercise his option to purchase the number of shares which he could have purchased on his retirement date, plus the number of additional shares which he would be entitled to purchase on his next accrual date, adjusted proportionately. If a holder who retired should die within three months after his retirement without having fully exercised his option, his option can be exercised for the same number of shares as the holder could have exercised for, within three months after his death (but not more than 10 years from the date the option is granted) by his estate or by a person who acquired the right to exercise such option by will or the laws of descent.

Options are not transferrable except by will or the laws of descent. During the lifetime of the original holder only he can exercise the options, and after his death only the person who acquires the right to exercise the options by will or the laws of descent can do so.

### Validity of the Plan Per Se Under Delaware Law

Plaintiff claims that the plan is invalid under the laws of Delaware. This raises a narrow question of the plan's validity *per se*. In resolving it the Court reserves for later discussion the legality of the option awards and the validity of the proxy statement.

Plaintiff's brief first refers to "general standards of the law", and then points specifically to three alleged defects in the plan: (1) the plan permits exercise after the cessation of employment, (2) it authorizes the issuance of "free stock", and (3) the board of directors failed to exercise any judgment as to the consideration for the options or the sufficiency thereof. (PB 55–57).

Plaintiff argues that since the option may be exercised three months after an employee departs from the company, the employee need only stay in the compa-

ny's employ for nine months before accruing the right to exercise the first quarter of the options. (PRB 26, Doc. 41). This argument is based upon a misreading of the plan. Unless an employee is entitled on his retirement date to exercise his option the right to do so does not survive. See Section 7 of the plan.

▉ The Brunswick plan is not invalid because of the three months provision. In *Gottlieb v. Heyden Chemical Corp.*, 33 Del.Ch. 82, 83, 90 A.2d 660, 661 (1952) the option plan authorized the exercise of an option within three months after an employee ceased to be employed. Had this provision been deemed to invalidate the plan the Court would have so held. It did not. Instead, it remanded the case for the Chancellor to compare the value of the services of the option recipients with the value ascribed to the options. Similarly, in *Beard v. Elster*, 39 Del.Ch. 153, 160 A.2d 731 (1960), the options were exercisable within six months following the termination of services. Notwithstanding this fact the options were held to be valid. *Kerbs v. California Eastern Airways*, 33 Del.Ch. 69, 90 A.2d 652 (1952), *reargument denied*, 33 Del.Ch. 174, 91 A.2d 62 (1952), relied upon by plaintiff, is not at variance with the *Gottlieb* and *Beard* cases. In *Kerbs* a plan was held to be invalid when the option could be exercised *in toto* immediately after its issuance. There was nothing in the plan which reasonably assured the corporation that it would receive the benefits contemplated by it, namely, services by the optionee for any period of time. In the instant case, the services were guaranteed for at least a year before any of the options could be exercised, and for a four year period before all of the options could be exercised.

As to the plaintiff's argument that the plan was defective in that it provides for "free stock", their brief only refers to the options and stock appreciation rights for 50,000 shares awarded to Hanigan. This attack does not relate to

the validity of the plan but to the manner in which it was administered—a subject which is later dealt with. In his argument, however, plaintiff has asserted that the plan was invalid because of the provisions for "variable option price" and the "stock appreciation rights". Plaintiff did not elaborate this position. Because of the absence of Delaware cases which have discussed any comparable plan it is desirable to speak to the point.

An option granted under the plan may at the discretion of the committee include stock appreciation rights which may be granted by the committee either at the time of the grant of the options or at any time thereafter. Each right shall relate to a specific option granted under the plan and shall be exercisable to the extent, and only to the extent, that the associated option is exercisable.

Plaintiff attacks the plan in both its option and stock appreciation rights aspects by arguing that these features of the plan permit Brunswick to issue "free stock", presumably meaning that it permits the issuance of stock without the payment of a cash consideration. This is true, for example, when the market price of the stock doubles the price at which the option was issued. In that event the option must be automatically exercised and the holder will receive stock without the payment of a cash consideration. In this case the prior services rendered by the option holder is a type of consideration which Delaware law recognizes as valid to support the issuance of stock. 8 Del.C. § 152.

Another circumstance when stock may be issued without the payment of a cash consideration is when the market price of the stock at the time when the option

and its associated stock appreciation right were granted increases but does not double. In this case a stock appreciation right holder may surrender for cancellation the exercisable portion of his option and receive without the payment of any cash the number of shares specified under the formula in the plan. See § 8.[4] The exercisable portion of the option which is surrendered in connection with this transaction is property received by the corporation. As such it constitutes consideration under Delaware law for the issuance of stock. 8 Del.C. § 152.

In sum, although the plan in certain circumstances provides for "free stock", as plaintiff characterizes it, such stock would nonetheless be supported by valid consideration under Delaware law.

Plaintiff's third point of attack on the "plan" involves two questions: (a) whether the terms of the plan, or surrounding circumstances, are such that the corporation may reasonably expect to receive the contemplated benefits from the grant of the options, and (b) whether when the options are granted there is a reasonable relationship between the value of the benefit passing to the corporation and the value of the options. *Beard v. Elster, supra,* 160 A.2d at 737. *See also Lieberman v. Becker,* 38 Del.Ch. 540, 542, 155 A.2d 596, 598 (1959); *Kaufman v. Shoenberg,* 33 Del.Ch. 211, 219, 91 A.2d 786, 791 (1952).

The first requirement can be determined from an examination of the terms of the plan itself, or surrounding circumstances, prior to the time when any options are issued. The second can be ascertained only after the specific option

4. The number of shares issuable under the formula will provide the recipient with a then profit exactly equal to that which he would have received if he had exercised his surrendered options and received stock for which he paid cash. The latter's profit per share would be the market price less the adjusted option price. The profit per share obtained by the holder of the stock apprecia-
tion right would be the market price less the cost of zero, he having received his stock "free". However, although he would realize a larger profit per share than the one who exercised his option and paid cash for his stock, he would receive a fewer number of shares than the latter. The aggregate profit attributable to each transaction would be the same.

awards have been decided upon. *See Gottlieb v. Heyden Chemical Corp.*, 90 A.2d at 666; Cf. *Lieberman v. Becker, supra*, 155 A.2d at 600–01.

In the instant case the plan itself made no mention of the persons who were to receive the options or the number to be awarded to each. The awards were made by a committee designated by the board of directors to administer the plan.[5] Hence, in appraising the validity of the *plan* attention must be focused *exclusively* on whether the terms of the plan are such as to make it reasonably likely that the corporation will receive the contemplated benefit if and when options are granted. Consideration of the relationship between the value of the benefit passing to the corporation and the value of the options is relevant only to the implementation of the plan when awards are made under it, not to the validity of the plan itself.

██ A provision in a plan which requires an optionee to remain in the service of a company for a designated length of time before he can benefit from the plan reasonably assures the corporation that it will receive the contemplated benefit. *Gottlieb v. Heyden Chemical Corp.*, 90 A.2d at 664. It constitutes "consideration passing to the corporation". *Lieberman v. Becker, supra*, 155 A.2d at 598. Even in the absence of an express agreement by an employee to remain in the employ of the company, consideration may be inherent in the terms of the plan, as for instance, a provision which prevents an employee from exercising an option unless he first renders substantial service to the company. *Gottlieb v. Heyden Chemical Corp.*, 90 A.2d at 664. Cf. *Stemerman v. Ack-*

*erman*, 40 Del.Ch. 431, 434, 184 A.2d 28, 30 (1962).

██ Under the Brunswick plan an employee could not exercise any portion of his option until he had worked a year, and then only for twenty-five percent of the optioned stock. He could not exercise the remainder of his option unless he worked for succeeding specified periods, the last of which expired four years after the option was issued. The terms of the plan are, therefore, reasonably calculated to secure for the company one of the important benefits which it was designed to obtain, namely, the retention of the services of the recipients.[6]

In *Beard v. Elster, supra*, 160 A.2d at 738, the Court stated that it was of prime importance that the adoption of a plan by the board have been an exercise of their independent business judgment that the plan would benefit the corporation by encouraging the retention of the services of valued employees. The Brunswick plan satisfies this test. Title 8 § 157 provides:

"In the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive."

The undisputed facts disclose that an independent board of directors adopted a plan the terms of which contained a type of consideration which the Delaware authorities have held to be valid. No fraud has been charged. Accordingly, by legislative fiat the judgment of the board as to the consideration reflected in the plan is conclusive. A partial summary judgment denying the plain-

---

5. The board of directors was authorized to delegate to the committee its authority to make awards. See 8 Del.C. § 141. *Kaufman v. Shoenberg, supra*.

6. Plaintiff contends that the provision in the plan which requires an employee to remain with the company for a period of time before he may exercise an option is not a valid consideration in the case of Hanigan. (PRB, Doc. 41, p. 27) The plaintiff points

out that he was almost 63 when he received twenty percent of all of the options and appreciation rights granted under the plan. This argument also goes not to the inherent terms of the plan itself but to whether the award made to Hanigan was justified—a matter which is relevant to the implementation of the plan by the action of the committee in making awards under it.

tiff's motion and granting defendants' motion concerning the validity of the terms of the plan will be granted.

### Implementation of the Plan

This brings the Court to the question of whether a reasonable relationship existed in fact "between the value of the benefits passing to the corporation and the value of the options granted." *Beard v. Elster, supra* at 737. This requires a determination whether the services of the option beneficiaries and the options can sensibly be deemed to be the subject of a fair exchange. *Gottlieb v. Heyden Chemical Corp.*, Del., 91 A.2d 57, 59 (1952); *Kaufman v. Shoenberg, supra*, 91 A.2d at 791. Treatment of this question varies depending upon whether or not the awards were made by the committee exercising its independent business judgment, or whether, as plaintiff contends, the awards were the product of control or domination exercised by Abernathy and/or Hanigan.

In the former case, i.e., where the committee exercised a "judgment", 8 Del.C. § 157 is relevant. Under its terms, the exercise of "judgment" creates a conclusive presumption that the consideration for the grant of the options was sufficient; consequently, the exchange would have to be deemed fair. On the other hand, if the committee was in fact dominated as plaintiff alleges, then the exercise of a "judgment" by the committee is lacking and the statutory presumption that the consideration is adequate is not applicable. The Court then must "evaluate the services to be rendered by the particular employees for the periods reserved, and to that factor

we must relate the values of the respective options." *Gottlieb v. Heyden Chemical Corp.*, 90 A.2d at 665. Moreover, there having been no shareholder approval of the committee's action, the burden of showing that the exchange was fair would be on the defendants. *Kaufman v. Shoenberg, supra*, 91 A.2d at 791.[7]

The record contains cumulative evidence which if believed establishes that the committee administering the plan exercised a discretionary business judgment in making the awards. Before the committee met on April 26, 1974, Abernathy, as President, solicited the recommendation of each division head as to the employees in their respective divisions meriting option awards and the priority of each. (Ab. 25–28).[8] Abernathy compiled the recommendations and made changes in accordance with his own judgment. (Ab. 27) Abernathy and Hanigan, the Chairman of the board, then met on several occasions for the purpose of agreeing upon the recommendations to be submitted to the committee. (Ab. 29; H. 58–59) This was done before the morning of April 26. (Ab. 31–33) The recommendations submitted contained no suggestions of a grant for Hanigan. (Ap. 45, 51, 54) At the committee meeting Hanigan was present to answer questions and explain management recommendations. (Ap. 45; R. 22) He neither voted nor participated in the deliberations of the committee. (S. 25, 34; Ap. 68) When there was a disagreement among the committee as to any award Hanigan would absent himself. (R. 13) This

---

7. Even if the committee had not acted independently in making the awards but the stockholders had approved their action the burden would have been on the plaintiff to prove that no person of ordinary sound business judgment would say that the consideration received for the options was a fair exchange for the options granted. *Olson Bros. v. Englehart*, 42 Del.Ch. 348, 351, 211 A.2d 610, 612–13 (1965), *aff'd* Del.Sup., 245 A.2d 166 (1968). In such a case the Court would be required to determine whether the awards

constituted waste or whether the question of the adequacy of consideration was so close factually as to fall within the exercise of a business judgment by the stockholders. *Beard v. Elster, supra* 160 A.2d at 737.

8. Reference is made to the record in the following manner: "Ab.", Abernathy's Deposition (Doc. 50); "Ap.", Appley's Deposition (Doc. 24); "H.", Hanigan's Deposition (Doc. 49); "S.", Sevcik's Deposition (Doc. 23); "R.", Rinfret's Deposition (Doc. 46).

was true when the number of options to be awarded to him was under consideration. (S. 24; Ap. 68, 81; R. 22) The committee changed the recommendation made by Hanigan for Abernathy as well as one other suggestion he made. (H. 59, 70–71; R. 40–41) Somewhere between ten to twelve names were specifically discussed. (R. 15–17; 47) In reviewing options to lower level employees the committee, having established the overall policy, relied on the judgment of senior management as to the specific merits of individual employees. (Ap. 52, 53; S. 9) The options which the committee on April 26, 1974 decided to grant as of May 1, 1974, were contingent upon the federal wage and price controls terminating on that date. (S. 13, 43) Hanigan, although an ex officio member of all committees, including the committee appointed to administer the plan, (Ap. 68; R. 11–12; S. 25, Brunswick Corp. By Laws, Art. V, Sect. 6. (See Doc. 39, Exh. C.)) was not a participant in the committee meeting on April 26 except to the extent indicated above. To the extent that the committee based the awards upon the management recommendations which in turn were based upon the recommendations of the heads of departments, this was a proper exercise of discretionary business judgment.

On the other hand, the record contains cumulative evidence which if believed would lead to the conclusion that the judgment of the committee in making the awards was influenced by Abernathy and Hanigan to such an extent that it was not a judgment reflecting an exercise of an independent discretion. Reference is made to the fact that Hanigan, the largest recipient of the options, was an ex officio member of the committee which made the awards. (Ap. 68; R. 11–12; S. 25; Brunswick Corp. By Laws, Art. V, Sect. 6 (See Doc. 39, Exh. C.)) Meetings of the committee were always attended by Hanigan. The "meeting" was held either in his office (Ap. 45–6), in his conference room (S. 8) or in the anteroom of his office (R.

11) When Hanigan and Abernathy prepared recommendations to submit to the committee after consultation with the heads of each department, (Ab. 29) a substantial amount of time was spent in this effort. (Ab. 29, 31–34; H. 76, 78) This contrasts with the scant amount of time, roughly an hour and a half, (Ap. 60, 64; R. 49) spent by the committee on April 26, in making the awards and dealing with other matters. The award of appreciation rights which the plan contemplated should have been made in the discretion of the committee was arrived at by Hanigan and Abernathy and was not even discussed by the committee. (R. 43; S. 74) Awards were always made under stock option plans as the Chairman recommended. (Ap. 45) The conversion ratio, i.e., the number of options under the 1974 plan which were to be given to option holders under the 1968 plan, the ratio being one to two, was tacitly agreed upon in August/September of 1973. (Ap. 75, 76; R. 65–66) This was months before the 1974 plan was adopted and nine or ten months before the committee made any awards under the 1974 plan.

 Were the Court faced with making findings as to the control or lack of it exercised over the committee in making the award of options, upon the basis of the present record the Court could probably do so. The posture of the case, however, does not permit this to be done. The case is before the Court on cross motions for summary judgment. Clearly the record is not in such shape as to permit the motion of either party to be granted. The issue whether the committee exercised an unfettered discretionary judgment in making the awards will have to be tried, as well as the concommitant issue of the sufficiency of the consideration for which the options were issued.

Plaintiff argues that the teaching of *Lieberman v. Becker, supra,* necessitates cancelling the awards which have been made and requires the granting of summary judgment in plaintiff's favor.

*Lieberman* actually sustained the option plan and did not decide whether or not the awards were valid. The case recognized that a committee charged with the administration of a plan should do so "in the good faith exercise of their considered business judgment." *Id.*, 155 A.2d at 600. Following this the Court said:

"Certainly, therefore, assignments of units will be made on the basis of the committee's judgment of the worth of the employee's services to the company, his length of service and contribution in the past and to be expected in the future to the company's prosperity, and numerous other factors, not the least of which should be their best guess of the future prospects of the company's stock on the open market. A decision by responsible businessmen reached after careful consideration of these factors, without bad faith or fraud, is entitled to weighty consideration by the courts. Cf. *Kaufman v. Shoenberg*, 33 Del.Ch. 211, 91 A.2d 786." *Id.*

It is this portion of the opinion upon which the plaintiff primarily relies in urging that the Brunswick awards be set aside, because, as he claims, the undisputed evidence shows that the committee failed to consider the factors enumerated in *Lieberman*. There are two answers to this contention. First, *Lieberman* did not state that unless the specifically enumerated factors were considered an award would have to be cancelled. It said only that if those and "numerous other factors" received careful consideration an award would not be upset under the business judgment rule. It cannot be believed that in *Lieberman* a Delaware court which so often has enumerated the broad and flexible discretionary business judgment rule intended to place directors or a committee charged with the making of awards in a discretionary straightjacket, as plaintiff argues. Second, at least for the purpose of plaintiff's motion for summary judgment, portions of the record support the conclusion that the factors referred to in *Lieberman* had in a broad sense been considered by the Brunswick committee, although the testimony of the committee members failed to show that they took into account factors which met the precise language of *Lieberman*. For example, Rinfret, one of the committee members, testified: (Rinfret Dep., Doc. 46, p. 24–26)

"Q . . .

But I wonder whether any evaluations of any of these people, apart from Abernathy and Hanigan, was presented by any member of the committee.

A Yes, Sir.

Q Who participated in that discussion?

A All three members of the committee.

Q You presented your evaluation of certain of these senior men?

A Yes.

Q What was the source of your information on their performance?

A I guess one might say that being a director of the company for quite a few years, and watching their performance, particularly taking into account their potential and what they were probably going to be able to do in the future, what they would contribute to the company, and most likely develop it, and whether or not particularly, and this is of the greatest concern to me, whether or not these are the kind of people that are going to make this company grow in the future or not.

Q Were those the factors that controlled your judgment as to whether or not they should be granted options?

A I would say that the governing factor in my own evaluation of these people is the importance to the corporation and to the growth and profitability of the corporation by the contribution of each of these individuals, number 1.

Number 2, their importance in the development of the management team of the company, including in that phrase 'management team' the realization that the chief executive officer will retire in two years under a mandatory retirement program, that there will have to be a new president appointed, and that these divisional presidents control businesses in excess of two hundred million dollars each and are major contributors to the growth of the company.

My evaluation of them in the discussion was fundamentally concerned with, are they important to the future of the company, and how important, and to what degree are they important.

I would use the word 'evolution'— the future evolution of the development of the company as a whole."

Awards by the committee based upon an evaluation of an employee's worth such as is disclosed by the Rinfret testimony would be adequate to satisfy the business judgment rule which *Lieberman* and many other Delaware cases have emphasized as being the guiding principle in the making of option awards. A predicate for this, to be sure, is the assumption that the committee which makes the awards is not a "controlled" committee but one which exercises an independent discretionary judgment. Whether this was true or not is an issue which will have to be tried.

*Proxy Statement*

Plaintiff contends that the proxy statement used by Brunswick to solicit votes for the plan violated section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) and Rule 14a–9(a) promulgated thereunder, 17 C.F.R. § 240.14a–9(a). Section 14(a) provides:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules

and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title."

Section 14(a) is implemented by Rule 14a–9(a) which in effect prohibits proxy solicitation by means of proxy statements which violate section 14(a) of the Act.

Plaintiff's attack upon the proxy statement falls into two categories: (1) omissions of material facts, and (2) by affirmative misrepresentations.

As to omissions, it may be assumed that at least some of these were material. Reference is made particularly to the failure of the statement to set forth the terms of the 1968 plan, which, upon adoption of the 1974 plan was to cease to be effective. In effect stockholders tence of the 1968 plan or replace it with were given a choice to continue the existhe 1974 plan. An intelligent choice was impossible unless both plans were before them.

Despite the desirability of Brunswick advising the stockholders of the terms of the 1968 plan, its disclosure was not necessary to make any of the statements in the proxy statement not false or misleading. Omissions constitute violations of the Act only if they are both material and make other statements false or misleading. Both section 14(a) and Rule 14a–9(a) say as much, and authorities have given effect to their plain meaning. *General Time Corp. v. Talley Industries*, 403 F.2d 159, 162 (2nd Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); *Gould v. America Hawaiian Steamship Company*, 331 F.Supp. 981, 986 (D.Del.1971); See II Loss, *Securities Regulation*, 917–24 (2d ed. 1961).

Other so-called omissions are not actionable because of their individual or cumulative effect for the reason that

none make the statements which were made either false or misleading. These omissions include the failure of the statement to calculate the dilutive effect upon the book value and earnings of the existing stock which would result from the exercise of the options; to disclose the price history of the Brunswick stock; to reveal which other companies had similar plans as indicative of the extent of the competition with which Brunswick was faced in obtaining top flight employees and executives. Other omissions among this non-misleading category include the failure of the statement to make known Brunswick's alleged policy of paying only nominal dividends as favorably effecting the value of the options; to make known that the Brunswick management considered its stock as substantially undervalued; and to tell the stockholders of the lack of relationship of the market price of the Brunswick stock to an employee's performance; and finally, the so-called questionable validity of the plan under Delaware law.

Plaintiff argues that the proxy statement contained an untrue statement of a material fact in that it stated that 400,000 was the maximum number of shares of common stock which could be issued pursuant to the plan, whereas, says plaintiff, if the stock appreciation rights were exercised, the difference between the number of shares initially available under the concurrently surrendered options and the lesser number of shares actually issued upon the exercise of the appreciation rights may be made available to other participants in the plan. This is true. But it does not f l-low that more than 400,000 shares can be issued. Even if the shares covered by the cancelled options are later issued pursuant to the exercise of subsequently granted options, the aggregate amount of shares issued under all options and upon the exercise of all participation rights still cannot exceed 400,000. A fair reading of the plan supports this conclusion. See Proxy, Exh. B. Sect. 3.

Plaintiff states that central to this claim that misrepresentations were contained in the proxy statement "was the patently false portrayal of the role of disinterested committee. Brunswick stated falsely that the committee would select the recipients and the number of options and appreciation rights each would receive." (PB 32). As stated in discussing the validity of the awards under Delaware law, the evidence bearing upon the discretionary character of the committee action is in dispute and cannot be adjudicated without a trial.

Plaintiff next asserts that the proxy material described appreciation rights and then stated that

"an option . . . may in the discretion of the committee, also include . . . appreciation rights, which may be granted by the committee either at the time of the grant of the option or at any time thereafter."

Plaintiff argues that in practice no discretion in this area was exercised and that the appreciation rights were awarded contemporaneously with the associated options without discussion by the committee, and that a shareholder anticipating disinterested discretion as a result of the proxy representation was misled in an area crucial to his decision.

The subject of whether the committee abandoned the discretionary function which the proxy statement stated that it would exercise cannot be resolved without a trial, as has been stated. A review of the relevant evidence at trial will necessarily encompass evidence bearing upon whether the awards of the stock appreciation rights were automatic whenever an option was granted, or whether the matter received the committee's discretionary consideration, either tacit or express.

Finally, plaintiff claims he is entitled to summary judgment because of a *per se* violation of section 14(a) of the Act. Rule 14a–3(a) prohibits solicitation unless each person solicited is concurrently furnished with a written proxy state-

ment containing the information specified in Schedule 14A. 17 C.F.R. § 240.-14a–3. Schedule 14A specifies the information required in a proxy statement and states in Item 11:

"If action is to be taken with respect to the granting or extension of any options, warrants or rights to purchase securities of the issuer or any subsidiary, furnish the following information:

. . . (iv) the market value of the securities called for or to be called for by the options, warrants or rights as of the latest practicable date . . . . "

Brunswick purported to comply with this requirement by stating that on February 12, 1974, the market price of the Brunswick stock was $15.25 (Proxy p. 19). The date of the proxy statement was March 25, 1974, when the price was $18.50. On April 26, 1974, when the stockholders approved the plan, the price of the stock was $15.25, and on May 1, 1974, as of which date the options were granted, the price of the stock was $16.-25.

Plaintiff argues that Item 11 requires that the proxy statement set forth the market value of the stock covered by proposed options on the date on which the proxy solicitation is begun, and that a failure to disclose such information constitutes a *per se* violation of the Act, and cites *Lewis v. Dansker*, 357 F.Supp. 636 (S.D.N.Y.1973). Whether or not Item 11 requires this need not be decided, for it is clear that when Brunswick furnished the stockholders with the market price on February 12, 1974, some six weeks in advance of the date of the proxy statement, this was too remote to satisfy Item 11. It could have been practical to have selected a market date much closer to the solicitation date.

Notwithstanding this violation of the proxy rules, plaintiff is entitled to no relief without proof of causation—that is that the violation reasonably could be thought to have effected the outcome of the vote. *See Dillon v. Berg*, 326 F.

Supp. 1214, 1234, n. 31 (D.Del.1971). In the cited footnote the Court pointed out the distinction between a violation of Rule 14a–3, which is of present concern, and a violation of Rule 14a–9, which the U. S. Supreme Court had before it in *Mills v. Electric Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1969). While in the latter case it was held that under Rule 14a–9 a material misstatement or omission in a proxy statement, without more, constituted a sufficient showing of a causal relationship between the violation and the injury which plaintiff claimed, *Dillion v. Berg* held that this was not true in the case of an omission which violated Rule 14a–3(a). The Court said, "*Mills*, applying only to Rule 14a–9 cases, would not affect this [Rule 14a–3(a)] causation requirement." 326 F.Supp. at 1235.

 Nothing in the record suggests that a revelation of the market price of the Brunswick stock as of any date closer to the initiation of the proxy solicitation might have altered the vote of the stockholders which were later cast. Accordingly, relief for the violation is not warranted.

### Class Action Representation

Plaintiff has moved for an order pursuant to Rule 23 that this action may be maintained as a class action on behalf of "all Brunswick shareholders, excepting officers and directors of Brunswick and persons acting in concert with them in the acts complained of." Defendants resist the motion asserting that plaintiff cannot "fairly and adequately protect the interests of the class", a prerequisite under Rule 23(a)(4). Defendants' position is based upon the fact that plaintiff is represented not only by a Delaware attorney but also by Cletus P. Lyman, a Pennsylvania attorney, with whom plaintiff is a partner in the firm of Lyman & Ash. Ash and Lyman each have a fifty percent interest in any sum which might be awarded to Mr. Lyman if plaintiff, as a representative of the class, should be successful in the lawsuit. Thus, the defendants argue that an irreconcilable

conflict exists between Ash's interest as a plaintiff stockholder and his interest as a partner of an attorney in the case.

The views of the courts differ, some by way of dictum and others by direct holdings, on whether the identity of a plaintiff and an attorney is a bar to such a plaintiff maintaining a class action. *Umbriac v. American Snacks,* 388 F.Supp. 265 (E.D.Pa.1975) and *Lamb v. United Security Life Co.,* 59 F.R.D. 25, 30 (S.D.Iowa, 1972) take the position that notwithstanding these circumstances a class action may be maintained. Other cases express a contrary view. *Leib v. Twentieth Century Corporation,* 61 F.R.D. 592 (M.D.Pa.1974); *Shields v. Valley National Bank,* 56 F.R.D. 448 (D.Ariz.1972); *Cotchett v. Avis Rent a Car System,* 56 F.R.D. 549 (S.D.N.Y.1972); *Graybeal v. American Savings & Loan Asso.,* 59 F.R.D. 7 (D.D.C. 1973); *Kriger v. European Health Spa,* 56 F.R.D. 104 (E.D.Wis.1972); *Eovaldi v. First National Bank,* 57 F.R.D. 545 (N.D.Ill.1972); *Stull v. Pool,* 63 F.R.D. 702 (S.D.N.Y.1974).

 It is unnecessary to choose between these two lines of authority at this time. This is because the final determination of the issue of represetative status should await the outcome of the appeal from the decision entered by Judge Muir in *In Matter of Goldchip Funding Company, et al.,* Civil Action No. 73–551 (M.D.Pa., March 28, 1975), which appeal is presently pending. The *Goldchip* decision, so long as it exists unreversed or substantially unmodified, raises serious questions as to whether plaintiff's personal qualifications meet the requirements for representative status. 7 Wright & Miller, *Federal Practice and Procedure,* § 1766 (1972).

For this reason the Court will deny plaintiff's motion to have the action declared to be a class action, without prejudice, however, to the right of the plaintiff to renew the motion if Judge Muir's findings and conclusions are reversed or substantially modified. Defendants' cross motion in opposition to maintaining a class action is to that extent granted.

### Derivative Action

The amended complaint purports to allege a derivative action on behalf of Brunswick against the individual defendants (¶ 1). Paragraph 17 alleges that on July 3, 1974, plaintiff made a demand on the Brunswick directors to cancel the options and obtain the relief sought in the original class (not derivative) action complaint filed on the same date. It alleges that no action has resulted nor is it foreseeable that such action will be taken because the board is dominated by those who benefit from the stock option plan. Except for the fact that the letter dated July 3 (copy of which is attached to the amended complaint) was sent, defendants have denied the allegations of paragraph 17. In addition, the individual defendants have moved for an order that the action cannot be maintained as a derivative action. F.R.Civ.P. 23.1 states:

> "The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association." [9]

The same reasons which disqualify plaintiff from maintaining a class action apply equally to his standing to sue derivatively. For this reason the motion of the individual defendants to enter an order denying plaintiff's right to maintain the action derivatively will be granted without prejudice to plaintiff moving to proceed derivatively if Judge Muir's findings and conclusion are reversed or substantially modified.

The defendants have advanced other reasons why the maintenance of the action in its derivative aspect should be

---

9. Neither 8 Del.C. § 327 nor Delaware Chancery Rule 23.1 contain this provision. The federal rules are rules of procedure and govern all actions in the federal district courts.

denied. These need not presently be considered but will be, if in the future plaintiff seeks to proceed derivatively.

### Conclusion

The motion of plaintiff for summary judgment as to liability is denied. The motion of defendants for summary judgment is partially granted insofar as the Court has determined that the option plan is valid under Delaware law; otherwise defendants' motion for summary judgment is denied. The motion of plaintiff for an order determining that the action may be maintained as a class action is denied without prejudice. The motions of defendants that the action may not be maintained as a class action or derivatively is granted without prejudice.